612 P.2d 500

Frank NATAROS and Anna Nataros, husband and wife, Plaintiffs/Counter-Defendants/Appellants,

v.

FINE ARTS GALLERY OF SCOTTSDALE, INC., an Arizona Corporation; Allen Goald and Sara Goald, husband and wife; Stanton M. Bier and Rosalie Bier, husband and wife, Defendants/Counter-Claimants/Appellees.

No. 1 CA–CIV 4393.

Court of Appeals of Arizona, Division 1, Department C.

March 20, 1980.

Rehearing Denied April 29, 1980.

Review Denied May 13, 1980.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, P.C. by P. Michael Whipple, Larry L. Smith, Phoenix, for plaintiffs/counter-defendants/appellants.

Law Offices of Donald Maxwell, P.C. by Donald Maxwell, Scottsdale, for defendants/counter-claimants/appellees.

## OPINION

JACOBSON, Judge.

This appeal from a directed verdict in defendants' favor raises the issues of whether plaintiffs, in an auction setting, proved a *prima facie* case of consumer fraud, negligent misrepresentation or common law fraud.

Plaintiffs/appellants, Frank and Anna Nataros, brought this civil action against defendants/appellees, Fine Arts Gallery of Scottsdale, Inc., its president and chief auctioneer, Stanton M. Bier, its salesman, Allen Goald, and their respective wives for consumer fraud, negligent misrepresentation and common law fraud arising out of the purchase by the Nataroses of certain items at an auction conducted by Fine Arts Gallery. The defendants counterclaimed for damages based upon theories of libel and slander. At the close of all the evidence, the trial court granted defendants' motion for a directed verdict on all counts of plaintiffs' amended complaint and likewise dismissed defendants' counterclaim. In addition, the trial court awarded defendants costs and attorneys' fees. The plaintiffs have appealed the granting of the directed verdict against them and the awarding of costs and attorneys' fees to the defendants. No appeal has been taken by the defendants from the dismissal of their counterclaim.

The facts which are material to the disposition of this appeal are stated in a light most favorable to the plaintiffs.

In January, 1973, Fine Arts Gallery was employed by contract to dispose of certain furnishings belonging to the Estate of Walker McCune and jewelry belonging to the late Mrs. John C. Fremont. This sale was originally to be conducted at the mansion of the late Mr. McCune and newspaper advertising appeared, heralding this forthcoming sale. These ads prominently displayed the names of Walker McCune and Mrs. John C. Fremont and in small print disclosed that "Note—Due to Commitments Prior to the Contractual Arrangements for the Sale of McCune Items, Other Fine COLLECTIONS WILL BE INCLUDED IN THIS SALE." The ads indicated the sale by auction would take place between January 13 and January 17.

However, due to litigation instituted by the Town of Paradise Valley (where the McCune Mansion is located) the sale was postponed until January 20 through January 24 and was held at the Bashas' Market in the K Mart Shopping Center, Scottsdale, Arizona.

It was Mr. Nataros' contention that based upon these newspaper ads, he attended the fine arts auction at the Bashas' Store on January 20, 1973 and purchased several items at auction. Mr. Nataros further testified that the items purchased on that date were without the advice of anyone.

On January 21, 1973, Mr. and Mrs. Nataros returned to the auction where they were approached by the defendant Allen Goald, a salesman for Fine Arts Gallery. Mr. Nataros advised Goald that he was ignorant of art values but wished to purchase some art as he believed it to be an effective hedge against inflation. Mr. Nataros testified that Goald informed him that he was an expert in the fine arts field and would advise Nataros concerning values of various paintings and silver being offered at the auction. Mr. Goald then gave Mr. Nataros a price range for each of the items involved in this litigation, informing him that if an item could be purchased at the lower end of the range, it would be a good investment or a bargain.

The advice given and the price paid by Mr. Nataros on the five items [1] purchased on January 21, 1973 were as follows:

| ITEM | GOALD'S ESTIMATE OF MARKET VALUE | | PRICE PAID |
|---|---|---|---|
| Painting by Mora | $ 9,000 to | $10,000 | $ 9,000 |
| Painting by Bacon | 6,000 | | 6,000 |
| Painting by Boggs | 10,000 to | 13,000 | 12,600 |
| Painting by Palmer | 6,000 to | 7,000 | 5,600 |
| Eight Piece Tiffany Silver tea set | 14,000 to | 16,000 | 14,500 |

The evidence further showed that the purchase of these items by Mr. Nataros was made through competitive bidding, in which more than one bid was received and in which Mr. Nataros made more than one bid

on each item. There was no evidence that the auction was rigged or that the other bidders were other than bona fide prospective purchasers.

On the third day of the sale, Mr. and Mrs. Nataros returned and, again acting upon the advice of Mr. Goald as to the estimated market values, Mr. Nataros made the following purchases: [2]

| ITEM | VALUE RANGE GIVEN BY GOALD | PRICE PAID |
|---|---|---|
| Paul Storr silver dinner plates | $ 25,000.00 | $20,000.00 |
| Painting by Sargent | 65,000.00 to 100,000.00 | 85,000.00 |

Again, the prices were arrived at through competitive bidding, with no evidence of collusion in the auction or bidding and Mr. Nataros made more than one bid on each item.

Mr. and Mrs. Nataros attended the auction on a subsequent day at which time a lot of jewelry was purchased. During the days the Nataroses attended the auction, they purchased 57 items for a total price of approximately $577,000.00.

On January 25, 1973, Mr. Nataros stopped payment on all of the checks delivered to Fine Arts Gallery. As a result of a conference between Mr. Nataros and Mr. Goald, Fine Arts Gallery agreed to cancel the sale of certain jewelry purchased at the auction by the Nataroses and to provide written appraisals on the remaining items. In return, Mr. Nataros reissued a check to Fine Arts Gallery for $286,777.00.

The written appraisals were prepared by Mr. Stanton M. Bier, President of Fine Arts Gallery, and consisted of simply adding a certain percentage to the price of each item purchased at auction. The evidence further disclosed that the items in dispute did not originate from the Estate of Walker McCune, but were obtained from a New York art dealer for inclusion in the auction.

1. Additional items were purchased by Nataros on this date, but are not the subject of this litigation.

2. Again, the Nataroses purchased additional items on this date which are not the subject of this litigation.

Approximately one year later, Mr. Nataros took the disputed items to the Los Angeles office of Sotheby, Parke Bernet, a worldwide auction firm, for appraisal. The appraisals received from that firm were substantially lower than the prices paid by Mr. Nataros at the auction.

At the time of trial, Mr. John Parkerson of Sotheby, Parke Bernet was established as an expert in appraising the items in dispute. He testified that the terms "auction value" and "fair market value" were synonymous and represented the price which he would expect an item to bring at auction. However, due to the number of dealers who participate in auction sales, these terms are more aligned to the wholesale value of the item rather than the retail value, as he would expect purchasers at auction to resell at a profit.

He further testified that it was not uncommon for the appraised "auction value" to be exceeded at the actual auction because of the interest by two or more individuals in the same item, the price being driven up during the bidding process. In addition, he testified that his appraisal of items for auction was based upon his review of what the item or a similar item sold for in the past at a major auction house. He noted, however, that he would not be influenced in his appraisal by what the item may have sold for at an auction conducted in Phoenix, Arizona. As Mr. Parkerson stated:

"An auction estimate is the range of expected price or expected value that an item will bring at an auction at Sotheby, Parke Bernet, an auction that I give."

On this premise, Mr. Parkerson appraised the items in question as of January, 1973, as follows:

| | | | |
|---|---|---|---|
| Palmer Painting | $1,000.00 | | |
| Bacon Painting | 1,000.00 | –– | $ 1,500.00 |
| Boggs Painting | 2,000.00 | –– | 2,500.00 |
| Mora Painting | 2,000.00 | –– | 3,000.00 |
| Sargent Painting | 25,000.00 | –– | 30,000.00 |
| Tiffany Silver | 4,000.00 | –– | 6,000.00 |
| Storr Silver | 7,000.00 | | |

Mr. Parkerson further testified that the estimated range of values given for these items by Mr. Goald and the written appraisal values given by Mr. Bier were "without factual basis." No other evidence was presented as to the falsity of the representations made by Mr. Goald or Mr. Bier as to the value of the items in question.

Based upon this record, the trial court directed a verdict in defendants' favor on all counts of plaintiffs' amended complaint.

It is basically the plaintiffs' position that these facts give rise to a *prima facie* action for consumer fraud, negligent misrepresentation, and common law fraud. We will discuss the consumer fraud count separately and the negligent misrepresentation and common law fraud counts together.

## CONSUMER FRAUD

Arizona's Consumer Fraud statute, A.R.S. § 44–1522, provides:

"A. The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

"B. It is the intent of the legislature that, in construing the provisions of subsection A of this section, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to §§ 45, 52 and 55(a)(1) Title 15, U.S.C.A. of the federal trade commission act."

Plaintiffs contend that three acts of "concealment, suppression, or omission of a material fact" by the defendants were shown by the evidence: (1) that the advertising would reasonably mislead a consumer into believing that all the items for sale at the auction were from the estate of Walker McCune; (2) that the values placed on the items by Mr. Goald were false; and (3) that the appraisals supplied by Mr. Bier were false. As the falsity of the values given by

Mr. Goald and Mr. Bier is more properly addressed under the fraud counts, we will discuss here only the misleading nature of the advertising.

We are aware that the Arizona Supreme Court has held that a violation of A.R.S. § 44–1522 gives rise to a private cause of action. *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974). It further appears that under the Consumer Fraud Act, reliance by the consumer on the unlawful act, as the term reliance is used in fraud actions, is not a prerequisite to obtaining relief. *See Peery v. Hansen*, 120 Ariz. 266, 585 P.2d 574 (App. 1978).

■ Be that as it may, it is clear that the misled consumer must have suffered some damage[3] as a result of the misrepresentation. *Peery v. Hansen, supra.* For purposes of this analysis, we assume that a trier of fact could have found that a purchaser at the auction reasonably could have believed that all of the items offered for purchase originated from the Estate of Walker McCune and that this was a misrepresentation falling within the purview of A.R.S. § 44–1522.

■ Even indulging in this assumption, no evidence was introduced in any form that such a misrepresentation resulted in any damage to the Nataroses. There is no evidence to show that if the items purchased by Mr. Nataros originated from the McCune estate, they would have a greater value than if purchased from a New York art dealer.

Having failed to prove an essential element of their desired cause of action under the Consumer Fraud Act—damages—the trial court properly directed a verdict in defendants' favor on this count.

## NEGLIGENT MISREPRESENTATION AND COMMON LAW FRAUD

■ An essential element of both a cause of action for negligent misrepresentation and for common law fraud is proof of the falsity of the representation. *Rice v. Tissaw*, 57 Ariz. 230, 112 P.2d 866 (1941); *Waddell v. White*, 56 Ariz. 420, 108 P.2d 565 (1940); *Arizona Title Insurance and Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 484 P.2d 639 (1971).

In this case the representations alleged to be false were the estimated market values placed on the items by Mr. Goald and Mr. Bier.[4]

■ The term "market value" has a fixed and readily understandable meaning, that is, the highest price in cash, which the property will bring when it is offered for sale by one who desires but is not obligated to sell and is bought by one who is under no necessity of having it. *In re Sears' Estate*, 172 Ohio St. 443, 178 N.E.2d 240 (1961); *see Department of Revenue v. Transamerica Title Insurance Co.*, 117 Ariz. 26, 570 P.2d 797 (App.1977). What the item actually sells for in the open market is normally the best evidence of its "market value." *Cf. Swain v. Santa Fe Pacific Railroad*, 24 Ariz. App. 349, 538 P.2d 1150 (1975).

■ In this case, the estimated market value given by Mr. Goald for each of the items purchased by Mr. Nataros was in the range of that actually established by free and open bidding at auction. There is no contention that the auction was contrived or that the other bidders were other than bona fide prospective purchasers seeking the same end as Mr. Nataros—to obtain the object at the least possible price. Nor was there evidence that Mr. Goald's estimates of values had the ring of self-fulfilling prophesies, that is, that all other bidders were operating under Mr. Goald's pre-established values. In short, the open market place

---

3. In their briefs before this court, the Nataroses only argue their entitlement to monetary damages. We therefore do not determine their entitlement to recision under the Consumer Fraud Act.

4. There is no contention that the items themselves are not genuine. Thus, the Sargent painting was actually painted by Sargent, the Mora painting was actually painted by Mora, the Tiffany silver is in fact silver from Tiffany's, etc.

established the truth or falsity of Mr. Goald's representations. At least, in Scottsdale, Arizona in January, 1973, the open market place established that those representations were accurate.

The Nataroses expert witness' opinion as to what these items should have sold for in Scottsdale, Arizona in January, 1973, cannot under these circumstances, raise a fact issue as to the value actually established, at least without evidence that the defendants were in some way responsible for the aberration, if it be an aberration, in the value established in that market place. For this reason, the case of *Pasternack v. Esskay Art Galleries, Inc.*, 90 F.Supp. 849 (W.D.Ark.1950), relied upon by the Nataroses, is distinguishable. In *Pasternack* not only the value, but the quality of the items were misrepresented and the value established at auction was created as a result of an auction which, in the words of the court, was "more or less a sham." *Id.* at 852. As to Mr. Bier's "appraisal," this conformed exactly to what the Nataroses' expert established as the "retail" value of the items sold at auction—the price paid at auction is increased to reflect what is generally considered the "wholesale" value established by that market place. If the value paid at the auction was its "market value" then Mr. Bier's appraisal was not false, based upon the expert's testimony.

The trial court, under the facts of this case, properly directed a verdict in favor of the defendants on the counts alleging negligent misrepresentation and fraud.

### ATTORNEYS' FEES AND COSTS

The trial court awarded the defendants both attorneys' fees and costs. On appeal, no issue is raised as to the propriety of attorneys' fees being awarded in this type of case or their reasonableness. Nor is there any contention that the costs were not necessarily incurred. Rather, the plaintiffs contend that since neither party prevailed on their respective complaint and

counterclaim, there was no "successful party" for the purposes of assessing costs under A.R.S. § 12–341,[5] relying upon *General Cable Corp. v. Citizens Utilities Co.*, 27 Ariz. App. 381, 555 P.2d 350 (1976). *General Cable Corp.* does seem to indicate that where there exists litigation on both a claim and a counterclaim and neither party is granted relief, there is no "successful party" to bring A.R.S. § 12–341 into play. However, when the cases cited in *General Cable Corp.* in support of this proposition are read, it is clear that what the court was holding was that under the facts of that case, the trial court did not abuse its discretion in determining that no "successful party" emerged.

We recently intimated in *Watson Construction Co. v. Amfac Mortgage Corp.*, Ariz.App., 606 P.2d 421 (1979), that a proper interpretation of A.R.S. § 12–341 might require apportioning costs based upon the respective successful positions maintained by the parties at the conclusion of litigation. However, until that issue is squarely presented to us, we decline to so rule.

For the time being, we are content to hold, based upon the totality of the litigation presented to the trial court, that it did not abuse its discretion in determining that in fact the defendants were the "successful party" in this particular lawsuit. *See Marcus v. Bowman*, 110 Mont. 412, 101 P.2d 68 (1940); *Hart v. Kerr*, 110 Utah 479, 175 P.2d 475 (1946).

Based on the foregoing, the judgment of the trial court is affirmed.

HAIRE, P. J., and CONTRERAS, J., concur.

---

5. Arizona Revised Statutes § 12–341 provides: "The *successful party* to a civil action shall recover from his adversary all costs expended or incurred therein unless otherwise provided by law." (Emphasis supplied.)