LANGEL CHEVROLET-CADILLAC, INC., APPELLANT, V. MIDWEST BRIDGE & CONSTRUCTION COMPANY, APPELLEE.

329 N.W.2d 97

Filed January 7, 1983. No. 81-724.

Tim Engler and Murray Ogborn of Nelson & Harding, for appellant.

David A. Domina of the Domina Law Firm, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

CAPORALE, J.

In this appeal the plaintiff-appellant, Langel Chevrolet-Cadillac, Inc. (Langel), seeks recovery of further damages for an alleged breach of a contract by the terms of which defendant-appellee, Midwest Bridge & Construction Company (Midwest), was to construct a concrete parking lot at the location of an automobile dealership owned by Langel. The suit, in substance, alleges breach of express and implied warranties in the failure to properly design and construct the parking lot in a workmanlike manner, with resulting inadequate and improper drainage. We affirm as modified.

After trial, the jury returned a verdict for Langel in the amount of $10,000, on which the District Court entered judgment. The District Court also entered judgment upon a directed verdict, without prejudice to any cause which Langel might have to recover damages from Midwest, in the amount of $8,000, which amount was the balance still due and owing on the contract. The trial court also awarded Midwest prejudgment interest on its $8,000 judgment and ordered each party to pay its own costs.

Langel urges that the trial court erred in refusing to instruct the jury to the effect that the implied warranty of fitness for a particular purpose would necessarily include the legal duty to design the parking lot at issue in a manner which would allow for "proper drainage"; further, that the court below erred when it gave an instruction regarding the liability of a contractor when such contractor has agreed to perform a given undertaking in accordance with prescribed plans; and, finally, that the court erred in directing a verdict for Midwest in the amount of the $8,000 sought in its cross-petition, in granting prejudgment interest thereon, and in ordering each party to pay its own costs.

Langel sought to construct and operate a facility from which to sell and repair automobiles at Norfolk, Nebraska. The process included the construction of a building on the site, followed by the construction of a parking lot, together with related work. Midwest was engaged on three separate occasions to do work. The first involved clearing the site for construction of the building and lot, this phase primarily consisting of removing vegetation; subsequently, Midwest was hired to bring in fill for the building area of the site; and finally, Midwest was hired to construct the parking lot.

The agreement for the construction of the parking lot would appear to be primarily oral in nature, although it was also memorialized in a brief written memorandum (which in reality was little more than a price list) dated September 19, 1978. Evidence was adduced, much of it in conflict, concerning the various communications between the parties as to the construction and design of the parking lot. The conflicts in the evidence are such that a jury could properly find the parking lot was in fact designed by Langel.

The trial court properly instructed the jury that Langel claimed Midwest was hired to design and construct the parking lot; that Midwest constructed the lot in a defective manner, such that the lot failed to drain properly; and that Midwest thus breached both express and implied warranties of workmanship and fitness for the intended purpose. The trial court also properly instructed the jury that Midwest denied Langel's claims and alleged it properly constructed the lot. After setting forth Langel's burdens of proof under its various theories of recovery, the trial court correctly instructed the jury as to the elements of express and implied construction warranties and as to what constitutes the circumstances under which certain warranties are implied. It then instructed as follows:

"Where a contractor makes an absolute and un-

qualified contract to perform a given undertaking, it is the general rule that he assumes the risks attending the performance of the contract. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not permitted to vary from prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended.

"Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled, and he remains liable only for defects resulting from improper workmanship or other fault on his part."

We first address Langel's contention that the trial court erred by its refusal to instruct the jury that Midwest's implied warranty of fitness for a particular purpose included an implied duty to design the parking lot in a fashion which would allow for proper drainage. The refusal did not constitute error, as Langel's request does not state the law in this jurisdiction under the evidence in this case. The authority from other states which Langel cites is unconvincing. Such consists of three North Dakota cases and one Minnesota case, all of which have differing factual bases for the results reached by the respective courts. In *Carlson Homes, Inc. v. Messmer,* 307 N.W.2d 564 (N.D. 1981), the factual recitation in the opinion indicates that the basis of the construction contract was a set of written plans of some detail in nature which were *not* later modified orally. In *Air Heaters, Inc. v. Johnson Elec., Inc.,* 258 N.W.2d 649 (N.D. 1977), the "design" was an express term of the contract, that is, the "design" was a specifically bargained-for element of

detriment for which consideration was given. In *Dobler v. Malloy*, 214 N.W.2d 510 (N.D. 1973), the court sets forth a four-part test required in order for liability to attach in a situation such as this. One of the four parts was that the owner have furnished no plans, designs, specifications, details, or blueprints. The record indicates that this was not the case here. Rather, the owner, on a number of occasions, gave direct and specific instructions as to the ultimate design and lay of the parking lot, even after construction had begun. Finally, in *Robertson Lumber Co. v. Stephen Farmers Co-op. Elev. Co.*, 274 Minn. 17, 143 N.W.2d 622 (1966), the court found specifically that the buyer had only specified the type of construction to be used, relying on the builder for the design thereof and all other details of construction. Therefore, that opinion is not relevant. Also, the court utilized the same four-part test set out in *Dobler, supra;* that test is not met in this matter for the reasons just enumerated. Since the instruction requested and now assigned as error does not express the law in this state and does not even in truth and fact express the law for this set of facts in the jurisdictions cited, it follows that the trial court's refusal to instruct in such a fashion was not error.

Langel's second assignment of error alleges an erroneous instruction as regards the liability of the contractor where the contractor agrees to perform a given undertaking in accordance with prescribed plans and specifications. We note, and Langel concedes, that the general rule is that where a construction contractor follows plans and specifications supplied by the owner which later prove to be defective or insufficient, he is not responsible to the owner for loss or damage resulting therefrom as a consequence of the defectiveness or insufficiency of such plans and specifications. See, e.g., *Farmers Mut. Home Ins. Co. v. Roberts & Dybdahl, Inc.*, 206 Neb. 651, 294 N.W.2d 369 (1980); *Fuchs v. Parsons Constr. Co.*, 172 Neb. 719, 111 N.W.2d 727 (1961).

However, Langel would contend that *State v. Commercial Casualty Ins. Co.,* 125 Neb. 43, 248 N.W. 807 (1933), would shift liability in this case. This is not so. Not only does *Commercial* not speak in terms of the contractor having made an express warranty as to the sufficiency of the builder's plans, as Langel claims it does, but the factual situation therein is completely different from that which we have here. In *Commercial* the State had had its own engineers prepare all the terms, plans, and specifications for the project. The contractor was limited to constructing the project as set forth therein. That case is therefore not apposite here.

Further, Langel argues that when it "orally" ordered changes in the plans and specifications, such as they were, for the project, Midwest necessarily warranted expressly to Langel that drainage on the modified lot would still be adequate and proper. A reading of the testimony of Midwest's employee Broders indicates that, while the matter was peripherally discussed, nothing was said or done that would rise to the level of an express warranty regarding drainage. Rather, this point is governed by *Fuchs, supra,* wherein we stated the law to be as contained in the trial court's instruction quoted above. This rule was cited later with approval in *Farmers Mut. Home Ins. Co., supra.*

The instruction given by the court correctly stated the law, and while the proffered paragraph concerning the shift of liability when a contractor has expressly warranted that an owner's plans and specifications are sufficient for the purposes intended may be technically correct, the evidence in the record before us indicates that its exclusion was correct. While there were conversations between Langel and Midwest's employee Broders in regard to various oral modifications of the plan, none of these conversations come close to rising to the level of an express warranty as to the sufficiency of the changes directed by Langel. Therefore, an instruction as to

such a shift of liability would have been improper.

Langel's third assignment of error concerns the directed verdict, without prejudice to its right to recover damages, entered in favor of Midwest on its cross-petition in the amount of $8,000, essentially the amount yet unpaid on the contract price. It is the rule in this jurisdiction that a contractor who has substantially performed his contract is entitled to the contract price less any damages proved to have been occasioned by the less than full performance. *Rickertsen v. Carskadon,* 172 Neb. 46, 108 N.W.2d 392 (1961). See, also, *Nebraska Plumbing Supply Co. v. Payne,* 84 Neb. 390, 121 N.W. 243 (1909). The parties stipulated that the contract entered into was substantially completed. Therefore, the trial court was justified in directing a verdict in favor of Midwest, without prejudice to Langel's ability to prove such damages, if any, as might have been occasioned by any breach by Midwest.

Next to be considered is Langel's claim that the trial court erred in awarding Midwest prejudgment interest on its cross-petition in the amount of $8,000. We agree with Langel. It is the rule in this jurisdiction that prejudgment interest is allowable only where the amount of the claim is liquidated; conversely, where reasonable controversy exists as to the plaintiff's right to recover or as to the amount of such a recovery, the claim is considered to be unliquidated and prejudgment interest is not allowed. *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900 (1982). See, also, *Omaha Paper Stock Co. v. Harbor Ins. Co.,* 596 F.2d 283 (8th Cir. 1979); *Frank McGill, Inc. v. Nucor Corp.,* 195 Neb. 448, 238 N.W.2d 894 (1976). In this case the amount of Midwest's claim was reasonably disputed and therefore necessarily unliquidated. Notwithstanding the pretrial stipulation of the parties that the contract had been substantially performed, the amount was subject to an offset by the damages claimed, and ultimately proved, by Langel. Therefore, Midwest was

not entitled to the prejudgment interest ordered by the court below.

The final point urged as error by Langel is the order of the lower court that each party pay its own costs. It is the rule in this jurisdiction that where it is not otherwise provided, costs should be allowed as a matter of right to the plaintiff upon a judgment in his favor in an action for the recovery of money only. Neb. Rev. Stat. § 25-1708 (Reissue 1979). At first blush it would appear that Langel was entitled to recover costs against Midwest. A more mature reflection upon the situation, however, indicates that such is not the case. Midwest was tantamount to a plaintiff on its counterclaim for the unpaid amount of the contract price; the fact that it is procedurally permitted by statute to bring its cause as a counter-claim should not preclude its recovery of costs when it in fact prevails on such counterclaim. See Neb. Rev. Stat. §§ 25-811 et seq. (Reissue 1979).

There is a division of authority as to how to assess costs in a situation of this nature. One approach is to award costs to whomever recovers the largest "net" judgment. That is, in a situation such as the one at bar, Midwest would be deemed the "net" taker, and would recover costs. For example, see *Owen Jones & Sons, Inc. v. C. R. Lewis Company,* 497 P.2d 312 (Alaska 1972). Another theory is that each party pays the costs of the other where a defendant prevails on his counterclaim after having been sued by a plaintiff. See *Spicuglia v. Green,* 302 So. 2d 772 (Fla. App. 1974). Finally, a third approach is for the court to simply address the "totality of the litigation," and to decree costs accordingly. See *Nataros v. Fine Arts Gallery of Scottsdale,* 126 Ariz. 44, 612 P.2d 500 (1980). We believe the just and well-reasoned rule, however, to be that in a situation such as the case at bar each party should pay the costs of the other. This would seem to be consistent with § 25-1708 and with certain Nebraska cases, *infra,* decided prior to the implemen-

tation of our modern rules of procedure. It is unlikely that in streamlining litigation there was any intent to routinely preclude a defendant who asserts his counterclaim, after having first been brought into litigation by a plaintiff, from recovering his costs in the event that he prevails on his counterclaim and is thereby effectively a plaintiff thereon within the meaning of § 25-1708. Older Nebraska cases which would seem to support this approach, although they of course do not address it as such, include *Ricenbaw v. Kraus,* 157 Neb. 723, 61 N.W.2d 350 (1953); *Stewart v. Spade Township,* 157 Neb. 93, 58 N.W.2d 841 (1953); and *Miller v. Henderson,* 76 Neb. 383, 107 N.W. 586 (1906).

Not inconsistent with this analysis is *Shellenbarger v. Shellenbarger,* 137 Neb. 762, 291 N.W. 95 (1940), cited by Langel. That case merely reiterated the statutory rule that § 25-1708 applies to actions for recovery of money only and that Neb. Rev. Stat. § 25-1711 (Reissue 1979) does not apply to such actions, but rather only to "other" actions. In view of this analysis, the correct order of the trial court would have been not for each party to pay its own costs but, rather, that each party pay the costs of the other.

In view of the foregoing analysis, the actions of the court below are affirmed as modified.

AFFIRMED AS MODIFIED.