GOTTSCH FEEDING CORPORATION, A NEBRASKA CORPORATION, AND ROBERT G. GOTTSCH, SR., APPELLANTS AND CROSS-APPELLEES, V. RED CLOUD CATTLE COMPANY, A COPARTNERSHIP, ET AL., APPELLEES AND CROSS-APPELLANTS.
429 N.W.2d 328

Filed September 16, 1988.    No. 86-680.

Robert G. Pahlke, of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, P.C., for appellants.

Robert G. Simmons, Jr., of Simmons Raymond, Olsen, Ediger, Selzer & Ballew, P.C., and Raymond B. Hunkins, of Jones, Jones, Vine & Hunkins, for appellees.

BOSLAUGH, CAPORALE, and GRANT, JJ., and BUCKLEY, D.J., and COLWELL, D.J., Retired.

CAPORALE, J.

Plaintiffs-appellants, Gottsch Feeding Corporation, a Nebraska corporation, and Robert Gottsch, Sr., both hereinafter collectively referred to as the owner, allege that the defendants-appellees and counterclaimant cross-appellants, Red Cloud Cattle Company, a Wyoming partnership, Edna Carpenter, individually and as trustee of the G. Willard Carpenter Trust, and Indian River Land & Cattle Company, another partnership, all hereinafter collectively referred to as the agister, damaged the owner by breaching a written contract obligating the agister to care for the owner's cattle. In its counterclaim, the agister alleges that the owner breached the contract by failing to pay as required by its terms. Following a bench trial, the court below offset various amounts it found to be due from one party to the other and entered judgment in favor of the agister in the amount of $49,953.75. In its appeal the owner asserts five errors, which may be summarized as claiming that the trial court erred in (1) computing its damages and (2) finding that the owner failed to avoid the consequences of the agister's known breach of the contract. The agister's cross-appeal asserts seven errors, which may be summarized as claiming that the trial court erred in (1) finding the agister breached its contract with the owner, (2) calculating the amount of damages the owner suffered, if a breach occurred, (3) failing to award prejudgment interest, and (4) speculating that the

agister may have stood in contempt of court. We affirm but modify the trial court's judgment such that the owner is to recover $53,910.50 from the agister.

At some unspecified time, Robert Gottsch, a farmer, rancher, and cattleman, engaged Tom Engleman, a professional cattle buyer, to purchase bred, that is, pregnant, cattle in Sioux and Goshen Counties, and to locate land for them in the same area. The owner considered the stock in the area to be excellent and the ranches to have "as good a grass as a man could purchase for livestock." Engleman learned that the agister was interested in leasing its ranch, consisting of about 40,000 acres of land straddling the border of Sioux County, Nebraska, and Goshen County, Wyoming, to a cattle owner, and put Edna Carpenter in touch with Gottsch. As a consequence, the parties entered into a written contract dated May 17, 1985.

So far as is relevant to our review, the contract obligated the agister to keep, properly care for, and feed the owner's breeding cattle for the calendar years 1985 through 1989, subject to there being "sufficient pasture." The agister was required to perform in a manner consistent with the "bred cow and calf raising practices in" the two counties in which its ranch was located, consult with specified animal nutritionists, provide specified supplemental feeds, and otherwise maintain the owner's herd at a proper nutritional level. The agister also guaranteed a 90-percent calf crop the first year and a 95-percent calf crop during the ensuing years, promising to pay the owner for any crop shortfall at the current market price at the time of weaning. The contract obligated the owner to pay $15 per month per cow pastured, no charge to be made for calves until weaned, and to pay a like amount per month per bull except during certain months of each year, during which period the bulls were to be fed at the agister's expense. Lastly, the contract gave the owner the right to remove its cattle from the agister's possession at any time the owner became dissatisfied with the care being provided.

The owner delivered a total of 2,839 head of cows to the agister, all but 68 of which had been purchased for the owner immediately prior to delivery, some from the agister itself. In addition, the owner delivered 98 of its bulls to the agister's care.

Some of the owner's cattle had been entrusted to the agister's care before the contract was executed.

However, even before the contract was signed, the owner became concerned about the care its cattle were receiving. By June of 1985 the owner undertook a systematic inspection of its herd. While, subsequently, some conditions about which the owner was concerned were corrected, others were not. As a consequence, by July 20 the owner put a full-time employee on the agister's ranch to monitor conditions, and began to look for other pastures but could not find any. In early August, Carpenter contacted Engleman and advised him that conditions were so dry the owner's cattle would have to be moved. At the owner's instruction, Engleman negotiated a longer stay so that another location could be found. The parties then agreed that the owner's cattle would be moved the first week in September. That, however, did not come to pass, and the owner instituted the action ultimately giving rise to these appeals, seeking at that time, in addition to damages for breach of contract, a temporary injunction preventing the agister from interfering with moving the owner's increased herd elsewhere. Because by then it was not being paid in accordance with the contract, the agister caused all of the owner's cattle to be moved into Wyoming, where, on September 9, it filed a lien against them notwithstanding the fact that the owner had been granted the right by the trial court to keep possession of its cattle upon posting a bond. The owner succeeded in obtaining a release of the Wyoming lien by posting a letter of credit with the Wyoming court. The petition the owner originally filed in the trial court was then abandoned, and the owner repled its cause as described in the first paragraph of this opinion. The owner's cattle were taken from the agister's care by no later than September 28, 1985; the move took a week of 16-hour days to accomplish.

Before proceeding further, it is necessary to determine the scope of our review. The general rule that whether a party is entitled to a trial by jury is determinable by the nature of the case at its inception, *Schmidt v. Henderson*, 148 Neb. 343, 27 N.W.2d 396 (1947), does not apply when the initial petition has been superseded by an amended petition which changes the

nature of the action. See *General Elec. Credit Corp. v. Richman*, 338 N.W.2d 814 (N.D. 1983), stating that the right to a jury is determined by the real, meritorious controversy between the parties as shown by all the pleadings.

As ultimately pled and tried, this action presented competing claims for damages arising from alleged breaches of the contract between the parties. As such, it is an action at law. *Fisbeck v. Scherbarth, Inc., ante* p. 453, 428 N.W.2d 141 (1988).

Thus, our review is controlled by two fundamental rules. First, in an action at law tried without a jury, it is not the role of this court to resolve conflicts in or reweigh the evidence; in such an instance this court will presume that the trial court resolved any controverted facts in favor of the successful party and will consider the evidence and permissible inferences therefrom most favorably to that party. *Suess v. Lee Sapp Leasing, post* p. 755, 428 N.W.2d 899 (1988); *Fisbeck v. Scherbarth, Inc., supra.* Second, in such actions the findings and conclusions of the trial court have the effect of a verdict and will not be set aside unless clearly wrong. *Lutheran Medical Center v. City of Omaha, post* p. 802, 429 N.W.2d 347 (1988); *Fisbeck v. Scherbarth, Inc., supra.*

Given the foregoing legal realities, little purpose would be served by detailing the voluminous and conflicting evidence concerning the causes of the failure of the owner's cattle to fare as well while in the agister's care as the owner would have liked. According to some witnesses, the dry conditions, and to others the condition of some of the cows themselves, were the cause; according to still other witnesses, it was the failure of the agister to use sound and accepted drought management practices. Some witnesses attributed the diminished second-year calf crop to the owner's failure to provide enough bulls to service the herd. Suffice it to say that the record adequately supports the trial court's finding that the adult cows' weight loss was not shown to be the result of the care provided by the agister. By the same token, the record adequately supports the trial court's findings that as a result of the agister's deficient care, the owner's first year calf crop was underweight by a total of 168,560 pounds and that as a consequence, the owner was

damaged at the rate of $.675 per pound, or a total of $113,778. The record supports as well the trial court's findings that the agister's deficient care produced a second-year crop shortfall of 80 calves, as the consequence of which the owner, taking into account the savings occasioned by the shortfall, was damaged in the net amount of $156 per unborn calf, for a total of $12,480.

Contrary to the finding made by the trial court, however, the pleadings do not admit that the agister failed to return 21 head of the owner's cattle. Rather, the record establishes that the owner regained possession of all or most of these cattle by self-help means. There are further suggestions in the record that a third-party landowner may have gained possession of several head of the owner's cattle from the agister after the owner's self-help repossession, but the record fails to establish the number of cattle thus lost by the owner, if any, nor their aggregate value. Thus, the trial court's finding that the owner is entitled to damages in the sum of $8,868.75 for 21 head of cattle not returned is clearly wrong.

The trial court's finding that the owner is entitled to reimbursement for the $1,045 it spent in posting the letter of credit required to release the Wyoming lien is also clearly wrong. Generally, one may not recover the costs of litigation and expenses incident thereto unless provided for by a statute or a uniform course of procedure. See, *Holt County Co-op Assn. v. Corkle's, Inc.*, 214 Neb. 762, 336 N.W.2d 312 (1983); *Nat. Bank of Commerce Trust & Savings Assn. v. Rhodes*, 207 Neb. 44, 295 N.W.2d 711 (1980). The owner does not cite us to, and our independent research fails to disclose, any statute or uniform course of procedure which permits a Nebraska court to award expenses incident to litigation instituted in a sister state.

As to the agister's counterclaim, the record supports the trial court's finding that it was owed $72,142.50 in unpaid pasture rent and $205 for trucking expenses incurred on the owner's behalf.

In complaining of the trial court's computation of damages in its first assignment of error, the owner asserts it should have been compensated for the agister's delay in selling those cows

which were not impregnated, that is open cows, and for the wages the owner paid its employees to inspect the herd and monitor conditions at the agister's ranch. The difficulty with this position is that the contract does not require the agister to sell open cows by any particular time, and the record supports the trial court's finding that the agister did not violate any direction the owner gave in that regard. Neither does the contract provide that any expenses the owner incurred in monitoring the performance of the contract or in collecting evidence of nonperformance would be paid for by the agister.

This brings us to the owner's second assignment of error, which asserts that the trial court erred in its legal conclusion that the owner should have avoided the damages resulting from the calves' weight loss. We begin our analysis of this issue by noting that the owner does not assert the trial court erred in its factual finding that the weight loss produced damages of $113,778; rather, the owner's claim is that the trial court erred in applying the doctrine of avoidable consequences. The applicability of the doctrine of avoidable consequences, being a question of law, *Welsh v. Anderson*, 228 Neb. 79, 421 N.W.2d 426 (1988), is a matter concerning which this court has an obligation to reach an independent conclusion. *Lutheran Medical Center v. City of Omaha, post* p. 802, 429 N.W.2d 347 (1988); *Kearney State Bank & Trust v. Scheer-Williams, ante* p. 705, 428 N.W.2d 888 (1988); *Fisbeck v. Scherbarth, Inc., ante* p. 453, 428 N.W.2d 141 (1988).

In *Welsh v. Anderson, supra*, this court recently noted that the "doctrine of avoidable consequences" is but another name for that which is more commonly referred to as the failure to mitigate damages. *Id*. at 82, 421 N.W.2d at 428. It is the well-established rule in this state that a wronged party will be denied recovery for such losses as could reasonably have been avoided, although such party will be allowed to recover any loss, injury, or expense incurred in reasonable efforts to minimize the injury. *Olson v. Pedersen*, 194 Neb. 159, 231 N.W.2d 310 (1975). Clearly, a plaintiff's failure to take reasonable steps to mitigate damages bars recovery, not in toto but only for the damages which might have been avoided by reasonable efforts. In approving an owner's use of an

improperly constructed grain-drying and storage complex, this court, in *Smith v. Erftmier*, 210 Neb. 486, 493, 315 N.W.2d 445, 450 (1982), stated that

> where there has been a breach of a contract by one party resulting in a loss to the other, it is the duty of such other party to take all reasonable steps to reduce the amount of his damages. It is the rule also that where one fails to perform such duty he may not recover damages which would have been avoided had such duty been performed.

(Citations omitted.) See, also, *Loomer v. Thomas*, 38 Neb. 277, 56 N.W. 973 (1893). In this case, the record clearly demonstrates that the owner took a series of reasonable, measured, and in some ways extraordinary steps to protect its investment. While it is true that the owner had the contractual right to remove its cattle from the agister's possession, it was not limited to that right. The record shows that for a period of time at least, the agister attempted to meet the owner's requests; that the owner's efforts to find new pastures were unavailing; that even after the agister told the owner to move its cattle, the parties agreed to an extension of the time within which to accomplish the task; and that the task was in fact accomplished with reasonable dispatch. Unfortunately, these measures achieved only limited success, but the blame for this lies not with the owner, but in the whims of nature or the failure of the agister to meet its contractual obligations, neither of which the owner could reasonably avoid. See, e.g., *Shurtleff v. Pick & Co.*, 103 Neb. 414, 172 N.W. 46 (1919), which holds that while parties were negotiating settlement, the purchaser was not required to avoid the consequences of the seller's failure to deliver merchandise.

Under the circumstances, the doctrine does not apply, and the owner is entitled to those damages caused by the agister's deficient care. Thus, the owner's total damages as the result of the agister's breach of the contract between the parties are $126,258; $113,778 for the calves' weight loss and $12,480 for the calf crop shortfall.

We proceed now to a consideration of the assignments of error presented by the agister's cross-appeal. The group of assignments which assert, in sum, that the agister did not breach the contract and that the trial court erred in computing

the owner's damages are resolved by the foregoing analyses of the owner's appeal. The agister did breach the contract, and the computation of the owner's damages as a result thereof is as described previously.

The assignment of error asserting that the trial court erred in failing to award the agister prejudgment interest is equally without merit. Prejudgment interest is allowable only where the amount of a claim is liquidated, that is, where no reasonable controversy exists as to the right to recover or as to the amount of such recovery. *Lutheran Medical Center v. City of Omaha, post* p. 802, 429 N.W.2d 347 (1988); *Suess v. Lee Sapp Leasing, post* p. 755, 428 N.W.2d 899 (1988); *Otto Farms v. First Nat. Bank of York*, 228 Neb. 287, 422 N.W.2d 331 (1988); *Langel Chevrolet-Cadillac v. Midwest Bridge*, 213 Neb. 283, 329 N.W.2d 97 (1983).

While it is true that the agister proved a right to recover for the services it provided under the terms of the contract, the setoff the owner proved renders the agister's claim unliquidated. *Langel Chevrolet-Cadillac v. Midwest Bridge, supra.*

In the remaining assignment of error, the agister complains that the trial court, in the course of rendering its judgment, wrote that in view of its ruling on the owner's abandoned application for a temporary injunction, it was "unknown to [the trial] court why no contempt proceedings were initiated by [the owner]." The fact remains, however, that the owner, having regained control of its cattle, abandoned its pursuit of the temporary injunction and proceeded to more fruitful endeavors. Under the circumstances, we need not concern ourselves with what might have been.

Thus, the agister's entitlement under the contract is $72,347.50; $72,142.50 for unpaid rent and $205 for trucking expenses.

Accordingly, the owner is entitled to recover $53,910.50 (its damages of $126,258 less the $72,347.50 owed under the contract) from the agister rather than the agister's being entitled to $49,953.75 from the owner, as determined by the trial court. The judgment of the trial court is affirmed as so modified.

AFFIRMED AS MODIFIED.