751 P.2d 530

**COLDWELL BANKER COMMERCIAL GROUP, INC., a Delaware corporation, Plaintiffs–Appellants, Cross Appellees,**

v.

**CAMELBACK OFFICE PARK, an Arizona joint venture; W.M. Grace Development Co., a Missouri corporation; and University Financial, a California corporation, Defendants–Appellees, Cross Appellants.**

No. 1 CA–CIV 8723.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 22, 1987.

215

Hiner, Crowe and Scott by Thomas N. Crowe, Phoenix, for plaintiffs-appellants, cross appellees.

Snell and Wilmer by Joel P. Hoxie and Eileen J. Moore, Phoenix, for defendants-appellees, cross appellants.

## OPINION

JACOBSON, Judge.

The issue raised by this appeal is whether a real estate broker owes any fiduciary duties to its principal during the period between termination of the agency and termination of the right to receive commissions earned during the agency.

The facts of this case are not in dispute and, for the most part, were stipulated to by the parties. Appellant, Coldwell Banker Commercial Group, Inc. (Coldwell), is a licensed real estate broker in Arizona. Appellee, Camelback Office Park (Camelback) is a joint venture formed in 1980 to develop a four-story office building known as the Camelback Arboleda, located at 1661 East Camelback Road in an area of Phoenix known as the East Camelback Corridor. The joint venturers were W.M. Grace Development Company, whose president was William Grace, and University Financial, whose chairman of the board was Richard Darley.

Prior to completion of the building, Camelback entered into a leasing listing agreement dated May 18, 1981, appointing Coldwell its exclusive agent for the leasing of space in the Arboleda.

The agreement provided, among other things, that the listing agreement could be terminated by Camelback for any reason upon giving Coldwell thirty days written notice. The agreement further provided that upon termination of the listing agreement, Coldwell was to submit to Camelback a list of prospective tenants with whom Coldwell was "actively negotiating" at the time of termination. Thereafter, if a lease was executed with any listed prospective tenant within a period of six months from the effective date of the termination, Camelback would recognize Coldwell as a "procurring broker," and a commission with respect to such lease would be paid Coldwell in accordance with the terms of the agreement.

Coldwell originally assigned two brokers, Ray Kilfoyle and Frank Ziska, to the project. Shortly after entry into the exclusive listing agreement, Darley and Grace became upset in discovering that Coldwell, through Kilfoyle and Ziska, also became the listing broker for the Transamerica building, a competing office building located in close proximity to the Arboleda. Grace and Darley, however, were persuaded to allow Coldwell to continue the exclusive agency on the condition that it would bring in John Armory, one of its most senior brokers, to secure tenants for the building. In a letter written to Grace on July 17, 1981, Armory disclosed the major office buildings that he was personally involved with in the Phoenix market and explained why he felt none of these buildings would be in competition with the Arboleda for tenants. One of the buildings he listed was the Hartford Corporate Center located in Northwest Phoenix in the Black Canyon Corridor. Amory indicated that the Hartford Corporate Center and the Arboleda would not appeal to the same kind of tenant since higher rental rates were commanded along the East Camelback Corridor than the Black Canyon Corridor. Amory closed by stating, "I would welcome the opportunity and challenge to do your building and feel there would be no significant conflict of interest."

Camelback accepted Amory who then became the listed broker for the Arboleda. Shortly thereafter, Amory learned from Ted Gianas, a self-employed real estate broker, that American Express was looking for additional office space in the Camelback Corridor. Gianas had been enlisted by William Newberry, a real estate manager for American Express, working out of its San Francisco office, to assist American Express in finding suitable office space in Phoenix. Gianas in turn requested information from Amory. Gianas advised Newberry of several possible sites including the Arboleda. On July 29, 1981, Amory provided Gianas with an outlined proposal for American Express' consideration to lease office space in the Arboleda which Gianas provided to Newberry.

In August, 1981, Amory, Gianas, Newberry, and the Camelback principals, Darley and Grace, met and initiated negotiations concerning the lease of office space in the Arboleda by American Express. These negotiations continued during 1982.

On July 21, 1982, Camelback terminated its listing agreement with Coldwell because it felt that Coldwell was not active enough in obtaining tenants for the building. Pursuant to the listing agreement, the termination was effective on or about August 20, 1982. On August 23, 1982, Coldwell submitted to Camelback its list of prospective tenants with whom it had been negotiating at the time of termination. The list included American Express.

Negotiations between American Express and Camelback continued although Coldwell was no longer involved. On August 24, 1982, Newberry signed a letter of intent addressed to Grace and Darley in which he outlined the lease proposal he was recommending to American Express' corporate management. The proposal called for American Express to lease approximately 45,000 square feet of office space, one full floor of the building, for four years with options to renew. Accompanying the letter was a $50,000 "good faith" deposit which Camelback was to retain in the event the proposal was not approved by American Express corporate management.

Unknown to any of the participants in these negotiations, all of whom believed the lease proposal would be approved, a third-party broker had directly contacted American Express' corporate management with a proposal for the lease of office space in the "Roth Building" in the Black Canyon Corridor at rates considerably less than those prevailing in the East Camelback Corridor. Based on these comparative rates, American Express instructed Newberry in October, 1982, to cease negotiations on the Arboleda and to pursue negotiations on properties in the Black Canyon Corridor.

On October 8, 1982, Newberry advised Amory by telephone that there had been a change of events and that American Express was now interested in leasing space in Northwest Phoenix. On October 12, 1982, Newberry met with Amory and Gianas and explained that American Express rejected the proposal for leasing space in the Arboleda and was interested in the Black Canyon Corridor. Newberry knew that Amory was the soliciting broker for the Hartford Corporate Center located in the Black Canyon area and asked about the availability of space in that building to accommodate American Express' need. Amory answered Newberry's questions about the Hartford Corporate Center. Within 48 hours after the meeting Amory prepared a lease proposal to American Express on the Hartford Corporate Center. Amory also showed the building to American Express officials. Thereafter, American Express entered into lease negotiations with the Hartford Corporate Center principals through Amory. During this time, Amory never raised the possibility of persuading American Express to reconsider the Arboleda proposal. Amory noted in an interoffice memo that as of this time "consideration for space in the Arboleda [for American Express] seemed to have ceased and an all out push would be made to move the operation [American Express] into the Corporate Center."

After receiving Newberry's call on October 8, 1982, Amory made no attempt to notify Grace or Darley that any problem with the lease negotiations had developed. At the meeting with Newberry on October 12, 1982, the parties discussed the need to inform the Camelback principals of the change of events. Since Newberry and Darley were personal friends, Newberry felt he should be the one to break the news to him. Amory agreed to let Newberry do so. Newberry did, in fact, reach Darley and gave him the news that the letter of intent had been rejected on or about October 15, 1982. Amory took no steps to insure that Darley had been so advised. Moreover, Amory made no disclosure to Grace or Darley concerning his dealings with American Express and the Hartford Corporate Center.

In late October, 1982, after Darley and Grace learned American Express was no

longer interested in leasing space in the Arboleda, they traveled to New York to meet with American Express corporate management to try to persuade them to reconsider their rejection of the Arboleda lease proposal. American Express indicated that Darley and Grace could continue to try to work something out through Newberry. Coldwell played no role in these negotiations between American Express and Camelback. Darley discussed with Newberry what concessions they would need to make in order for American Express to reconsider leasing space in the Arboleda. Ultimately, Camelback and American Express entered into a lease on January 11, 1983, for 45,048 square feet of office space in the Arboleda after Camelback agreed (1) to pay American Express a $500,000 cash supplement, (2) to pay for all of American Express' tenant improvements instead of merely giving an improvement allowance, and (3) to give additional free parking. In total, Camelback gave American Express approximately $800,000 in additional concessions not provided in the August, 1982 letter of intent.

After the lease was executed Coldwell notified Camelback that it was entitled to a real estate commission since the lease was entered within the six-month period after the listing was terminated and American Express was one of the prospective tenants with which Coldwell had been involved in active negotiations. When Camelback refused to pay the commission, Coldwell filed suit seeking payment of $135,144.00 in commissions.[1] Camelback urged that Coldwell was not entitled to a commission because it breached fiduciary duties owed to Camelback and because Coldwell's efforts in connection with the lease ultimately entered into was too minimal to entitle it to a commission. Additionally, Camelback sought affirmative relief in a counterclaim, arguing it had been damaged by Coldwell's hindering, delaying and interfering with the execution of the potential lease between Camelback and American Express.

The counterclaim requested a million dollars in damages.

Following trial, the court concluded that Coldwell was not entitled to a commission. In reaching this conclusion, the trial judge made the following findings of fact:

18. In December of 1982, the defendants made substantial lease concessions to American Express and a lease was finally signed in January of 1983, and said lease was drastically different from the terms of the lease being considered prior to October, 1982.

19. That the subsequent lease agreement had no causal connection to the negotiations that took place while, and immediately after, Coldwell Banker was the leasing broker.

20. That the purpose of the protected tenant list no longer existed when American Express terminated negotiations; the parties knew that the deal was dead; Coldwell Banker abandoned placing American Express with the defendants, and attempted to lease the other space.

21. That while the defendants had a duty and/or obligation to pay a commission if the original lease proposal was signed and also an obligation to pay if the lease was a product of Coldwell Banker's efforts and/or similar to the ongoing negotiations; Coldwell Banker also had a duty not to try to lure American Express away from the defendants.

22. The court has not found any precedent or any case precisely on point during its research, but is of the opinion that no commission was earned under the circumstances.

The trial court also found that Camelback did not prove its counterclaim. It therefore denied affirmative relief to either party. The trial court ordered both parties to pay their own attorneys' fees and costs.

Coldwell appeals from the trial court's determination that it was not entitled to a commission. Camelback cross appeals from the denial of its request for attorneys' fees and costs.

---

1. Since the trial court found no commission due, it did not reach the issue of whether Coldwell would also have been entitled to additional commissions for American Express' exercise of options to lease additional space.

To prevail, Coldwell must establish (1) that it was entitled to its commission under the terms of the agreement between the parties and, (2) that it did not do anything to forfeit its right to the commission earned.

## DID COLDWELL EARN A COMMISSION?

We start with the question of whether Coldwell earned its commission by doing the things it was required to do under the listing agreement. It is clear that the agreement provided that Coldwell could be entitled to a commission even though a lease was executed after Coldwell's listing was terminated. Thus, the agreement did not require that Coldwell be the "procuring cause" of the lease as that term is used under Arizona law. *See Clark v. Ellsworth*, 66 Ariz. 119, 122, 184 P.2d 821, 822 (1947); *Fink v. Williamson*, 62 Ariz. 379, 158 P.2d 159 (1945). Instead, the parties agreed that Coldwell would be "recognized" as the procuring broker and would be paid a commission for any lease entered into within six months after termination of the listing if Coldwell had been "actively negotiating" with the prospective tenant at the time of the termination and if it submitted that prospective tenant's name to Camelback.

Clauses of this type are referred to as "extension clauses." An informative discussion of the purpose of extension clauses, their effectiveness, and the expressions normally used in them appears in *Mellos v. Silverman*, 367 So.2d 1369, 1371–72 (Ala. 1979):

Extension clauses provide that the broker is entitled to a commission notwithstanding the expiration of the term of the listing agreement if the property is sold to one with whom the broker, prior to such expiration, negotiated or had some other form of dealing described in the agreement. The purpose of such a clause is to protect the broker by preventing the owner from postponing acceptance until the listing agreement has expired and thereby circumvent the broker's right to compensation for locating a

purchaser. The validity and enforceability of extension clauses have been universally upheld.

The owner and broker are free to frame their agreement as they see fit and may make the broker's commission dependent upon whatever conditions they agree upon so long as such conditions are not unlawful or contrary to public policy. Under the language typically employed in extension clauses, it is not necessary that the actions of the broker be the "procuring" cause of the sale although the broker must show some minimal causal connection between his efforts and the eventual sale. . . .

The expression used most frequently in extension clauses is that the broker must have "negotiated" with the buyer which has been construed as requiring that the broker interest the prospect to the extent that he becomes a likely purchaser, or, coming to terms or arranging the terms and conditions of a sale. Other expressions include to "offer," or "quote," or "submit" the property to the purchaser. These expressions have been construed to require less activity by the broker than the term "negotiate." (Citations and footnote omitted.)

Arizona courts have also recognized that parties may agree that a broker is entitled to its commission under circumstances where the broker is not the "procuring" cause of the sale or lease. In *Galbraith v. Johnston*, 92 Ariz. 77, 80, 373 P.3d 587, 589 (1962) the Arizona Supreme Court stated:

Provisions in exclusive listings whereby the owner of real property agrees to pay a commission to the broker if the property is sold to one whom the broker has had negotiations prior to the expiration of the listing have been enforced irrespective of the fact that the broker is not the effective, efficient and procuring cause of the sale. . . .

\* \* \* \* \* \*

This Court has repeatedly ruled that parties have a legal right to make such contracts as they desire provided only that it is not for an illegal purpose or against public policy. A party can not

complain of the harshness of the terms nor expect a court to relieve him of the consequences. (Citations omitted.)

The same result was reached by Division 2 of this court in *Hyde Park–Lake Park, Inc. v. Tucson Realty and Trust Company*, 18 Ariz.App. 140, 500 P.2d 1128 (1972). *See also* Annot., 27 A.L.R.2d 1348 (1953) and 51 A.L.R.3d 1145 (1973) for other cases on this subject.

In the case before us, it is apparent that the trial court concluded that Coldwell did not do the things that would have entitled it to a commission. It reached this conclusion after making express findings that the lease entered into by the parties was drastically different from the terms of the lease being considered prior to October, 1982; that the subsequent lease agreement had no causal connection to the negotiations that took place while, and immediately after, Coldwell Banker was the listing broker; and that the purpose of the protected tenant list evaporated when, among other things, American Express terminated negotiations and the parties knew that the deal was dead.

■ Setting aside for the moment the issue of whether Coldwell committed acts which would have caused a forfeiture of its right to a commission, we find that the trial court erred in concluding that Coldwell did not do the things that would have entitled it to a commission under the terms of the listing agreement. Coldwell was not the "procuring broker" as that term is defined by case law. However, the parties made no such requirement. They merely provided that Coldwell would earn a commission if, at the time of termination, it had been "actively negotiating" with a prospective tenant whose name was on the submitted tenant list and who entered a lease within the subsequent six-month period.

There is no dispute that Coldwell was actively negotiating with American Express at the time of termination of the listing. The fact that the negotiations were interrupted by American Express' total rejection of the lease and later resurrected solely by Camelback's efforts and concessions does not support a finding that

Coldwell was not at least minimally connected with the lease that resulted.

*Lloyd Hammerstad, Inc. v. Saunders*, 6 Wash.App. 633, 495 P.2d 349 (1972), the only case cited by Camelback in support of its position, is not applicable. In that case the broker merely pointed at a house and told the eventual buyer that the house was for sale. Assuming the validity of the legal conclusions in that case, the facts are in no way similar to those in this case where Amory engaged in extensive activity designed to effect a lease and fulfilled the parties' express requirement in the extension clause of "actively negotiating" with the prospective tenant at the time of termination of the listing.

Where parties bind themselves by a lawful contract and the terms of that contract are clear and unambiguous, a court must give effect to the contract as written. *Estes Company v. Aztec Construction, Inc.*, 139 Ariz. 166, 168, 677 P.2d 939, 941 (App.1983). A court cannot " 'revise, modify, alter, extend or remake' a contract to include terms not agreed upon by the parties." *Isaak v. Massachusetts Indemnity Life Insurance Company*, 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981). The parties in this case did not provide in the listing agreement that even though Coldwell was actively negotiating with a prospective tenant, a commission would not be earned if the prospective tenant rejected the deal and had to be persuaded to return to negotiations or if the terms finally reached were not the same as those previously being negotiated. The court cannot impose these additional terms upon Coldwell.

### DID COLDWELL FORFEIT ITS COMMISSION?

We now turn to the question of whether Coldwell forfeited its rights to a commission by any actions it took after termination of the listing. The trial court found that Coldwell had a duty not to try to lure American Express away from the defendants and that Coldwell breached this duty by abandoning Camelback and instead trying to lease other property to American Express.

The evidence which supports these findings is: (1) Coldwell made no attempt to try to renew American Express' interest in the Arboleda after it learned that American Express decided not to lease at that location; (2) Amory did not disclose to Camelback that American Express lost interest in the Arboleda; (3) Amory presented a proposal to American Express for leasing another building, the Hartford Corporate Center, and personally showed this building to American Express officials; (4) Amory took these actions without disclosing to Camelback that he was doing so; (5) In trying to convince American Express to lease space in the Corporate Center, Amory was acting in direct competition with Camelback who was trying to rekindle American Express' interest in the Arboleda; and, (6) Amory was trying to earn a commission by placing American Express in the Corporate Center at the same time that he was expecting a commission from Camelback. These acts are sufficient to find a breach of a fiduciary duty to Camelback, if such a duty existed. The issue for this court to determine is whether Coldwell owed a fiduciary duty to Camelback after its agency was terminated, but during the term of the extension period.

 A broker who breaches his fiduciary duty to his principal is not entitled to a commission. *Mason v. Bulleri*, 25 Ariz. App. 357, 360, 543 P.2d 478, 481 (1975). A broker is under a duty to keep his principal fully informed and to fully disclose all matters known to him which might affect the transaction. *Ornamental and Structural Steel, Inc. v. BBG, Inc.*, 20 Ariz.App. 16, 19, 509 P.2d 1053, 1056 (1973). The *Restatement (Second) of Agency* (1958) provides at § 469 concerning disloyalty or insubordination of the agent:

An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty....

Comment (a) provides that:

An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to

compensation which otherwise would be due him because of the transaction.

 Coldwell first argues that no fiduciary duty exists because the listing agreement provided that it was not Camelback's agent. Although the listing agreement refers repeatedly to Coldwell as Camelback's agent, it expressly provides that Coldwell was to be an independent contractor and that no agency relationship was created between the parties.

In our opinion, this language, while negating a general agency relationship does not excuse Coldwell from any fiduciary duties arising as a result of its status as a broker. The agreement made it clear that Coldwell was not being given general agency powers which would allow it to control transactions and bind its principals. *See generally State v. Superior Court*, 120 Ariz. 501, 586 P.2d 1313 (App.1978). Coldwell has never denied that it was Camelback's broker under the agreement. The fiduciary duties here arise not out of a general agency, but from Coldwell's relationship as a broker for Camelback. As explained in 12 Am.Jur.2d *Brokers* § 3 (1964):

Although a broker is, broadly speaking, an agent, the word "agent" is a broader term than "broker," more comprehensive in its legal scope, for while every broker is in a sense an agent, not every agent is a broker. A broker is distinguishable from an agent generally by reason of the fact that his authority is of a special and limited character in most respects. (Footnotes omitted.)

A broker occupies a confidential and fiduciary relationship with his principal, and hence is held to the highest ethical standards of fairness and honest dealings. *Ornamental and Structural Steel, Inc. v. BBG, Inc.*, 20 Ariz.App. at 19, 509 P.2d at 1056. We hold that the agreement does not negate the existence of fiduciary duties.

Next Coldwell argues that, even if fiduciary obligations were created by the listing agreement, these obligations ceased by the time it showed American Express the competing building because the agreement pro-

vided that upon termination "this agreement and the parties' rights and obligations hereunder shall terminate automatically."

■ We agree generally that after an agency has terminated, the obligations the agent bears during the agency, including the duty of disclosure, no longer exist. The agent is free to act for himself or the opposing party with the one exception that he must not hinder, delay or interfere with the transaction his former principal is involved in and from which he expects a commission. *See, e.g., Hardy v. Davis,* 223 Md. 229, 164 A.2d 281 (App.1960); *Olson v. Brickles,* 203 Va. 447, 124 S.E.2d 895 (1962).

■ However, the contractual relationship that existed between the parties here was not completely severed at the termination of the brokerage. Rather, Camelback agreed that for a period of six months thereafter it would be liable for commissions under certain conditions. We have upheld the validity of this agreement. What then is the minimal legal relationship existing between the broker and its principal during this extension period? Insofar as the broker's right to a commission is concerned, the principal may not, through collusion with the purchaser, postpone the consummation of the transaction until the extension period expires and thus deprive the broker of a commission. *See Langford v. Pioneer Land Co.,* 250 So.2d 165 (La. App.1971); *Wells v. Andreas,* 135 Wis. 319, 115 N.W. 792 (1908). While the reason for these rulings are not clearly articulated, it appears that at least the principal owes a duty of good faith to its broker, even after termination of the agency. We see no reason why a corresponding duty of good faith is not owed by the broker to its principal during the extension period. *See Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 569 (1986) (holding that an obligation of good faith is implied in all contracts).

At a minimum, this obligation of good faith would prohibit Coldwell from competing with Camelback for American Express as a tenant or from hindering, delaying or interfering with Coldwell's efforts to secure American Express as a tenant. In our opinion, the evidence supports the finding that Coldwell committed these acts. Coldwell argues that it was justified in its competitive activity since its listing agreement did not provide for it to exclusively represent Camelback. There are cases holding that where there is no agreement to exclusively represent one principal, the broker is free to show other properties. *See, e.g., Foley v. Mathias,* 211 Iowa 160, 233 N.W. 106 (1930); *Lemon v. Macklem,* 157 Mich. 475, 122 N.W. 77 (1909). We have found no authority, however, that has allowed competition under the circumstances of this case. As stated in comment (a) to § 394 of the *Restatement (Second) of Agency:*

> [A]n agent has a duty not to act for a competitor of his principal unless this is permitted by the understanding of the parties. This is true although the agent does not agree to give his full time to the principal's business and does not use the time paid for by the principal in acting for another. The danger that he will not be impartial and that he will use confidential information obtained in the business of one in the affairs of the other makes it improper for him to act for both.

Comment (b) provides that the agent is entitled to act for competitors only if the principal has reason to know that the agent believes that he is privileged to do so.

Even though this listing agreement did not provide for Coldwell to exclusively represent Camelback, Coldwell understood that Camelback was very concerned that its broker not show buildings that would be in direct competition with the Arboleda. Amory disclosed to Camelback that he had the Hartford Corporate Center as one of his listings, but assured it that the Corporate Center would attract a different type of client from that attracted to the Arboleda and that therefore there would be no significant conflict of interest. In this situation, Coldwell would not have had reason to believe it was privileged to act in the competitive manner that it did.

We hold that by breaching its duty of good faith to Camelback by competing with it and in failing to disclose that it was

doing so, Coldwell forfeited its right to a commission from Camelback.

## CROSS APPEAL

We now turn to the question of whether whether the trial court erred in refusing to award Camelback costs and attorneys' fees. Camelback sought costs and attorneys' fees in the trial court arguing it was the successful party to the litigation. Coldwell argued that neither party was entitled to costs and attorneys' fees because neither party prevailed on its claim or counterclaim. Alternatively, it argued that since it prevailed on Camelback's counterclaim, it should be entitled to attorneys' fees for that portion of the case. The trial court denied costs and attorneys' fees to both parties, stating: "Good issues, good case. Each side to pay their own attorneys' fees and costs."

Camelback has not cross appealed from the trial court's denial of relief on its counterclaim. It argues, though, that in spite of its failure to prevail on its counterclaim, it was the successful party to the litigation as a whole. Camelback reasons that if it was, in fact, the successful party to the overall litigation, it was mandatory that the trial court award it costs and attorneys' fees.

We agree with Camelback that if it is considered to be the successful party to this litigation, an award of costs and attorneys' fees was mandatory. A.R.S. § 12–341 provides that the "successful" party to a civil action "shall" recover costs. It is well settled that the award of costs to the "successful" party is mandatory under this statute. *Trollope v. Koerner*, 21 Ariz. App. 43, 47, 515 P.2d 340, 344 (1973).

While reasonable attorneys' fees recoverable under A.R.S. § 12–341.01(A) by the "successful" party in a suit arising out of contract are not mandatory, this statute further provides that "[t]his section shall in no manner be construed as altering, prohibiting or restricting present or future contracts or statutes that may provide for attorney's fees." In *Sweis v. Chatwin*, 120 Ariz. 249, 252, 585 P.2d 269, 272 (App. 1978), we held that A.R.S. § 12–341.01 is not applicable in situations where the parties have provided in their contract the conditions under which attorneys' fees may be covered. Here, the parties provided in the listing agreement that the "successful or nondefaulting party ... shall recover from the unsuccessful or defaulting party a reasonable sum for its attorney's fees." Since the parties provided for a mandatory award of attorneys' fees to the successful party, A.R.S. § 12–341.01 cannot be applied to give the trial court discretion in whether to award attorneys' fees. If Camelback was the "successful party" to this litigation, it was entitled both to costs and reasonable attorneys' fees.

■ We next consider whether, as a matter of law, Camelback should have been declared as the successful party to this litigation where it prevailed on Coldwell's complaint even though it lost on its own counterclaim. Camelback has cited one 70-year-old case from Minnesota, *Ballard Transfer & Storage Co. v. St. Paul City Ry. Co.*, 129 Minn. 494, 152 N.W. 868 (1915), that seems to hold that a defendant who prevails on the plaintiff's claim is entitled to costs as the prevailing party to the litigation even if he loses on his counterclaim because the defendant might never have brought the counterclaim if the plaintiff had not brought suit.

We find this logic to be faulty. First, we do not agree with the argument that the defendant might have filed its claim merely in defense to plaintiff's suit is the determinative factor in whether the defendant is the successful party. Second, in situations where each party would be inclined to sue the other, this rule would punish the one who reached the courthouse first.

In *General Cable Corporation v. Citizens Utilities Company*, 27 Ariz.App. 381, 385, 555 P.2d 350, 354 (1976), where both the claim and counterclaim were dismissed, the defendant argued it was the prevailing party because it had not sought as much relief in its counterclaim as the plaintiff had sought in its complaint. The trial court disagreed and ordered each to bear its respective costs. The appellate court upheld the trial court finding that under

the facts presented, neither had been successful. This does not mean that there can never be a successful party in such a case. In *Nataros v. Fine Arts Gallery of Scottsdale, Inc.*, 126 Ariz. 44, 49, 612 P.2d 500, 505 (App.1980), the trial court found the defendant to be the successful party even though neither won relief on its claim or counterclaim. The appellate court upheld this ruling finding that upon the totality of the litigation presented, the trial court did not abuse its discretion in determining that the defendants were the successful party. It is clear from reading these cases that the trial court has discretion to determine from all the circumstances whether there is a successful party where neither has obtained relief on its claim or counterclaim.

In *Ocean West Contractors v. Halec Construction Co.*, 123 Ariz. 470, 600 P.2d 1102 (1979), the Arizona Supreme Court indicated that when a claim and counterclaim are two separate actions, each should be dealt with individually with regard to attorneys' fees. It indicated that when the claim and counterclaim involved the same contract, though, the trial court should look at the whole picture and decide whether there was a successful party. In the present case, the claim and counterclaim arise out of the listing agreement entered by the parties and the relationship created by that agreement, therefore, it is necessary to look at the totality of circumstances to determine if there was a successful party. Camelback has not demonstrated that it would have been an abuse of discretion for the trial court to conclude that neither party was successful. Certainly the fact that Camelback requested far more damages in its counterclaim than Coldwell sought in its complaint was a factor for the trial court to balance against the fact that the litigation largely centered on the issue raised in the complaint of whether Coldwell was entitled to a commission.

■ We would sustain the trial court's decision that each party bear its own costs and attorneys' fees were it not for the fact that we are unable to conclude whether the trial court found that there was no successful party. It seems possible from the trial court's comment of "[g]ood issues, good case," that the trial court was exercising discretion to deny attorneys' fees and costs without regard to whether it had found a successful party in the litigation. Since we have determined that an award of costs and attorneys' fees was mandatory if there was a successful party to the litigation as a whole, we remand for clarification by the trial court. If the trial court denied attorneys' fees and costs to Camelback because it found that neither party was successful, the trial court's ruling on the request for attorneys' fees and costs is affirmed. If, however, the trial court found Camelback to be the successful party and it made a discretionary denial of attorneys' fees and costs, we hold that an award of attorneys' fees and costs to Camelback was mandatory, and that the amount of costs and attorneys' fees should be determined by the trial court in further proceedings.

## ATTORNEYS' FEES ON APPEAL

Camelback requests an award of attorneys' fees incurred in this appeal. We find Camelback to be the prevailing party in this appeal. We award Camelback its attorneys' fees on appeal in the amount to be determined after Camelback's compliance with Rule 21(c) of the Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

This matter is remanded to the trial court for further proceedings consistent with this decision regarding Camelback's claim for attorneys' fees and costs. In other respects, the judgment of the trial court is affirmed.

SHELLEY, J., concurs.

MEYERSON, Presiding Judge, dissenting in part.

I dissent from that portion of the majority opinion holding that Coldwell forfeited its commission by its actions after termination of the listing agreement.

First, the majority finds that Coldwell breached its "duty not to lure American Express away from the defendants" be-

cause Coldwell made no attempt to renew American Express' interest in the Arboleda. The terms of the contract between Coldwell and Camelback, however, expressly forbade Coldwell from continuing negotiations on Camelback's behalf after the termination of the listing. Coldwell could not have breached any fiduciary duty by "abandoning" Camelback, when the express terms of the contract required it to do so.

Second, the majority relies on the fact that Amory did not disclose American Express' loss of interest in the Arboleda to Camelback. Coldwell was advised on October 12, 1982, that American Express had rejected Camelback's proposal. This event occurred almost two months following the effective termination of the contract between Coldwell and Camelback on August 20, 1982. Again, according to the express terms of the parties' contract, all duties and obligations between them ended upon the effective termination date. Coldwell owed no duty to disclose to Camelback the information it gained from Newberry, particularly when Coldwell believed that Newberry would inform Camelback directly that the deal was rejected. In fact, Newberry did phone Camelback and advised it that the deal was "dead" on November 15, 1982. Thus, Coldwell's failure to inform Camelback three days previously that the deal was "dead" could not have possibly breached a duty to Camelback.

Although the majority concedes that an agent has no duty of disclosure after termination of the agency, it concludes that Coldwell fell within the exception to that rule—an agent may not "hinder, delay, or interfere" with its former principal's transaction. Coldwell could not have harmed Camelback when at the time Coldwell made a proposal to American Express, Camelback's deal was "dead." Furthermore, Camelback ultimately achieved its transaction with American Express through its own subsequent efforts and additional inducements. Camelback has not shown that, but for the proposal by Coldwell to American Express, it would have closed its deal with American Express any sooner or at any less cost. In fact, the trial court

expressly found otherwise by denying Camelback's counterclaim.

Similarly, the cases relied on by Camelback do not support its claim that Coldwell hindered, delayed, or interfered with its transaction. The Maryland Court of Appeals, although stating the exception relied on by the majority, found no reason to deviate from the general rule that an agent has no continuing duty after the agency terminates. *Hardy v. Davis,* 223 Md. 229, 164 A.2d 281 (App.1960). The New Mexico Supreme Court has held that the fiduciary duty may continue after the expiration of the agreement only when certain factors are met, none of which are present in this case. *See Swallows v. Laney,* 102 N.M. 81, 691 P.2d 874 (1984) (factors include course of conduct between the parties, extent of broker's holding out as principal's advisor and confident, principal's dependence on broker, and lack of sophistication of principal in real estate matters). In Arizona, Division Two, in an analagous situation, has held that the fiduciary duty of a broker terminates upon the rejection of the principal's initial offer, and then the broker is free to pursue the highest price on its other listed property. *Marmis v. Solot Co.,* 117 Ariz. 499, 573 P.2d 899 (App.1977).

In this case, it is significant that Coldwell and Camelback freely negotiated the terms of their own contract. This is not a case involving unequal bargaining power, overreaching, or unconscionability of contract terms. Camelback was the drafter of the listing agreement, and chose not to include an anticompetitive clause or any other provision for a continuing fiduciary duty on Coldwell's part after termination of the agency. Camelback was aware that Coldwell also listed the Black Canyon property, yet did not contractually restrict Coldwell's right to compete with the Arboleda property, because the general understanding was that the two properties would likely attract different types of clients.

The record does not indicate that Coldwell "lured" American Express away from the Arboleda; rather, the evidence shows that a third party "lured" American Express to the Black Canyon area through its listing of the Roth Building. The record clearly indicates that the Camelback deal

was "dead" on October 12, 1982; that Coldwell first approached American Express two days later, to negotiate a deal in a different geographic location, at a time when Coldwell had no existing fiduciary duty to Camelback. Camelback did not even begin to reopen its negotiations with American Express until late October, 1982, and did not offer American Express the $500,000 incentive to reconsider the proposal until December 2, 1982. Coldwell's negotiations with American Express thus took place during a period in which there were no ongoing negotiations between Camelback and American Express, and during which Coldwell owed no fiduciary duty to Camelback. Although I agree that there is an implied duty of good faith in every contract, I find no breach of good faith under these circumstances. At the time Coldwell negotiated with American Express, it did not expect any commission under the terms of the extension clause, because the deal had died. Because the facts fail to show that Coldwell hindered, delayed, or interfered with Camelback's negotiations, I would hold that Coldwell did not forfeit its commission, and would reverse the decision of the trial court.