751 P.2d 542

**COLDWELL BANKER COMMERCIAL GROUP, INC., a Delaware corporation, Plaintiffs–Appellants, Cross Appellees,**

v.

**CAMELBACK OFFICE PARK, an Arizona joint venture; W.M. Grace Development Co., a Missouri corporation; and University Financial, a California corporation, Defendants–Appellees, Cross Appellants.**

No. CV–87–0124–PR.

Supreme Court of Arizona.

March 10, 1988.

Reconsideration Denied April 12, 1988.

Hiner, Crowe & Scott by Thomas N. Crowe and Lewis and Roca by John P. Frank, Steven W. Bender, Judith Messinger, Phoenix, for plaintiffs-appellants, cross appellees.

Snell & Wilmer by Joel P. Hoxie, Phoenix, for defendants-appellees, cross appellants.

FELDMAN, Vice Chief Justice.

Petitioner, Coldwell Banker Commercial Group (Coldwell), seeks review of a court of appeals' opinion holding that it breached a real estate broker's duty of good faith to its principal by showing additional properties to a prospective tenant and thereby forfeited its right to a commission. We granted review to consider the scope of activities a broker may lawfully undertake on behalf of multiple principals. *See* Rule 23, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## STATEMENT OF FACTS

Coldwell is a nationwide real estate broker with offices in Phoenix. Camelback Office Park (Camelback) is an Arizona joint venture formed in 1980 to develop a four-story office building known as the Camelback Arboleda in Phoenix's exclusive Camelback district. The joint venturers were W.M. Grace Development Company, whose president was William Grace, and University Financial, whose board chairman was Richard Darley.

On May 18, 1981, Camelback and Coldwell entered into a listing agreement drafted by Camelback. By its terms, Coldwell was to be the "sole and exclusive renting and leasing agent" for the Arboleda, though the agreement specified that the parties did not intend to create an agency relationship between them. It also authorized Camelback to terminate the agreement for any reason upon thirty days' written notice. Pursuant to an extension clause in the agreement, Coldwell could submit a list of the prospective tenants with whom it was actively negotiating at the time of termination. If Camelback made a lease with any of the listed prospects within six months, Camelback was to recognize Coldwell as a procuring broker and pay a commission.

Coldwell assigned the Arboleda listing to two junior brokers. Camelback soon discovered, however, that one of them also represented another large office development in close proximity to the Arboleda. To allay Camelback's concerns about the competition threatened by this other listing, Coldwell reassigned the listing to John Amory, one of its most senior brokers. On July 17, 1981 Amory wrote to Grace, disclosing all the major office buildings in Phoenix with which he was personally involved and explaining how each would appeal to a different clientele from the Arboleda. One of these was the Hartford Corporate Center (Hartford). Amory wrote of this development: "[I]t appeals basically to the service industry who generally will not pay the higher rental rates commanded along the ... East Camelback Corridor[]." Camelback was apparently satisfied with Amory's explanation, and did not terminate the Arboleda listing with Coldwell.

Within two weeks of the listing's being assigned to Amory, he received a call from Ted Gianas, an independent real estate broker in Phoenix. Gianas had been retained by William Newberry, a real estate manager with the American Express Company (Amex), to locate office space for Amex in Phoenix. In late July 1981, Amory made his first proposal for an Amex lease in the Arboleda, and the negotiations thus begun continued with varying degrees of progress until October 1982. Many of the communications during this period took place directly between Amex and Camelback. More particularly, they took place between Amex's Newberry and Camelback's Darley, who traced their roots to the same hometown and high school in Missouri.

The negotiations were punctuated by two letters of intent from Newberry to Camelback, outlining the Arboleda lease proposals he was recommending to Amex's corporate management. The first came in March 1982, for approximately 84,000

square feet. Although the principals never reached agreement on its terms, Darley believed as late as August 3, 1982 that the March letter of intent was still viable.

Whether or not it was, it is uncontroverted that negotiations between Amex and Camelback were ongoing on July 21, 1982 when Camelback gave Coldwell notice of termination of the exclusive listing agreement. In fact, on August 24, 1982, four days after the effective date of the termination, Amex submitted a second letter of intent to Camelback, this one for 45,000 square feet in the Arboleda.

As provided by the listing agreement, Coldwell responded to the termination by giving Camelback a list of prospective tenants to whom it had shown the Arboleda. Amex was included on the list. As required by the agreement, Coldwell then ceased all negotiations on behalf of Camelback. The record reveals no further activity regarding the Amex–Camelback lease until October 1982.

In that month, Amex's corporate management in New York rejected the August lease proposal, and the Amex–Camelback negotiations appeared to be dead. Amex's corporate management had independently learned of the availability of office space in Phoenix's Black Canyon Corridor. Because of that area's lower rentals, management instructed Newberry to abandon negotiations for the Arboleda and pursue space in the Black Canyon Corridor. Newberry informed Amory of these developments in a telephone call on October 8, 1982. The two arranged to meet early the following week. Before their meeting took place, however, Newberry and another Amex corporate officer toured two office buildings in the Black Canyon Corridor, including the Hartford. When Newberry met with Amory and Gianas the following day, October 12, 1982, he asked Amory to provide a proposal on the Hartford. Amory complied with this request within forty-eight hours and shortly thereafter showed the Hartford building to Amex's space planner and other Amex officials, including Newberry.

At Newberry's meeting with Amory and Gianas on October 12, 1982, the three men also discussed the necessity of informing Camelback about Amex's change of plans. Newberry testified about this discussion:

Well, I think the concern was that we had worked so long and hard on this deal. I still felt the Arboleda was superior to any of the other buildings we were looking at, but with my past association with Mr. Darley, how do we tell these people this because we knew that there would be an explosion.

I volunteered and felt it was up to me since it was American Express that really did this. Coldwell Banker had nothing to do with the fact that we were changing locations, and I felt that it was because I had so much personal relations with Mr. Darley that it would be my obligation, to put it in a vernacular, it would be a cop-out for me to hide behind Mr. Amory and let him deliver the bad news.

Reporter's Transcript (RT), Apr. 9, 1985, at 65. Approximately three days later, Newberry duly informed Darley that Amex's corporate management had rejected the Arboleda proposal. Amory confirmed with Newberry that the message had in fact been conveyed, and a few days later, in a telephone conversation initiated by Grace, Amory reiterated the message to Grace. Additionally, Amory informed Grace that, at Amex's request, Coldwell was showing Amex other properties, including the Hartford.

Hoping to revitalize the apparently defunct deal, in late October or early November Camelback developed a plan to negotiate directly with Amex's corporate management in New York. The parties agree that Coldwell was not informed of this development: "I didn't want them ... to even know what we were doing," Grace testified. RT, Apr. 9, 1985, at 125. The major breakthrough in the renewed negotiations came in early December when Camelback offered Amex a $500,000 cash incentive to reconsider the August proposal. Camelback made additional concessions regarding tenant improvements and parking space in the next month, and on January

11, 1983 Amex signed a four-year lease for 45,000 square feet in the Arboleda.[1]

This litigation arose when Camelback refused to pay Coldwell the $135,000 commission it claimed under the exclusive leasing agreement's extension clause. Camelback claimed that Coldwell was not entitled to a commission because it breached fiduciary and contract duties owing to Camelback by hindering, delaying and interfering with the execution of a lease between Camelback and Amex. Camelback claimed that these duties arose when Camelback and Coldwell entered into the exclusive leasing agreement and continued through the six-month period the extension clause was in effect following termination. Coldwell sued for its commission, and Camelback counterclaimed for damages of $1,000,000.

The trial court found that there was no causal connection between the lease eventually entered into and the negotiations that had taken place during and after the term of the exclusive listing with Coldwell. It therefore concluded that Coldwell was not entitled to a commission. Though the trial court also found that Coldwell had breached its "duty not to try to lure" Amex away from the Arboleda, it concluded that Camelback did not prove its counterclaim. Coldwell appealed.[2]

The court of appeals found that the trial court "erred in concluding that Coldwell did not do the things that would have entitled it to a commission under the terms of the listing agreement." *Coldwell Banker Commercial Group v. Camelback Office Park*, 156 Ariz. 214, 220, 751 P.2d 530, 536 (Ct.App.1987). Given the terms of the listing agreement,[3] we agree with

this result and did not accept review of that issue. However, the court went on to find that Coldwell forfeited its right to the commission. It reasoned that a broker owes its principal a fiduciary duty during the term of their contract. *Id.* at 221–222, 751 P.2d at 537–538. Once the contract is terminated, the broker is generally free to act for himself, "with the one exception that he must not hinder, delay or interfere with the transaction his former principal is involved in and from which he expects a commission." *Id.* at 221–222, 751 P.2d at 537–538. When the contract contains an extension clause, however, a duty of good faith continues throughout the extension period. *Id.* at 222, 751 P.2d at 538. Coldwell breached this duty, the court of appeals concluded, by competing with Camelback and by hindering, delaying or interfering with Camelback's efforts to secure Amex as a tenant. *Id.* at 222, 751 P.2d at 538. Coldwell petitioned us for review.

## DISCUSSION

In considering the scope of activities which a real estate broker may lawfully undertake on behalf of multiple principals, we address, first, the broker's duties during the term of the listing agreement and, second, its duties after the agreement has terminated.

■ Arizona law clearly recognizes the existence of a fiduciary duty between broker and principal. *Baker v. Leight*, 91 Ariz. 112, 116, 370 P.2d 268, 271 (1962). The broker's duty is breached and his commission forfeited if he acts adversely to his

---

1. Darley conceded at trial that except for the substantial, but separate, concessions made by Camelback to Amex, the January lease was very similar to the lease proposed by Newberry in August 1982.

2. Camelback cross-appealed from the trial court's denial of its request for attorneys' fees and costs. The court of appeals remanded this matter to the trial court for a determination of whether there had been a "successful party" below. If there was, the court of appeals held that an award of attorneys' fees and costs was mandatory. *Coldwell Banker Commercial*

*Group v. Camelback Office Park*, 156 Ariz. 214, 224, 751 P.2d 530, 540 (Ct.App.1987).

3. The listing agreement provided:

Upon ... termination, ... Agent will submit to Camelback an accurate list of prospective tenants with whom Agent was actively negotiating at the time, and if a lease is executed with any such prospective tenant within a period of six (6) months from the effective date of termination ..., Camelback will recognize Agent as a procuring broker and a commission with respect to such lease shall be paid....

principal's interests. *Ornamental & Structural Steel, Inc. v. BBG, Inc.,* 20 Ariz.App. 16, 19, 509 P.2d 1053, 1056 (1973) (quoting 12 Am.Jur.2d *Brokers* § 168 (1964)). However, neither the law of the marketplace nor the general common law construes the duty so broadly as to prohibit the broker from offering the properties of all his principals to a prospective customer. *McEvoy v. Ginsberg,* 345 Mass. 733, 737, 189 N.E.2d 546, 548 (1963); *Foley v. Mathias,* 211 Iowa 160, 162, 233 N.W. 106, 107 (1930); *Lemon v. Macklem,* 157 Mich. 475, 478, 122 N.W. 77, 78 (1909); Annotation, *Right of Real Estate Broker to List Competing Properties of Different Owners,* 71 A.L.R. 699 (1931); 12 Am.Jur.2d *Brokers* § 87 (1964).

In *McEvoy,* the plaintiff real estate broker telephoned the owner of a vacant building to inform him of the possibility of a lease with a given manufacturing company. Broker and owner agreed that if the former arranged a lease, the latter would pay him $5,000. The facts of the subsequent negotiations closely parallel those among Coldwell, Camelback, and Amex. The broker's suit for a commission met with many of the same defenses raised in the present case. We are concerned here with the owner's defense that the broker was guilty of a breach of loyalty for suggesting that the prospective tenant consider leasing another property. In *McEvoy,* where the broker did in fact initiate the suggestion, the Massachusetts court held that, in the absence of a special restrictive covenant, a real estate broker is free to offer the properties of all his principals to a prospective customer. 345 Mass. at 737, 189 N.E.2d at 548. It upheld the trial court's denial of the owner's motion for a directed verdict. *Id.*

In *Foley,* a property owner similarly refused to pay his broker a commission on the grounds that the broker had accepted a listing for a competing property. In reaching the same result as the *McEvoy* court, the *Foley* court explained:

> The situation in this case is analogous to that which arises when a real estate agent has listed with him a number of houses for rent and a lease to one of

them is made to the customer of the real estate agent. Every owner of the houses is a rival of every other owner for the lease with the real estate agent's customer; but can it be said that, because the real estate agent has several houses listed with him, therefore, the real estate agent cannot recover his commission for leasing one of them to one of his customers without the intelligent consent of both? Manifestly not.

> If the rule contended for by the appellant in this case did obtain, as is well stated by the appellee, no real estate agent in Iowa could have more than one house listed in his office at one time if he expected to recover his commission....

211 Iowa at 162, 233 N.W. at 107.

■ Though Coldwell did much less than the *McEvoy* broker to turn the prospective tenant's attention to another property, we find that the *McEvoy* rule and *Foley* rationale soundly reflect the realities of the marketplace. Unless a principal contracts for the exclusive time of a broker—and is willing to pay the higher fee which such a contract invariably demands—a broker must be free to represent all his principals. He does not act adversely to any one of them so long as he presents each property in its best light and does not unfairly favor one principal over another.

■ We do not read in Amory's July 1981 letter to Grace any such promise to represent Camelback to the exclusion of any other owner. To the contrary, the letter's enumeration of the other office buildings Amory was showing gave Camelback ample notice that Coldwell was representing other principals. Further, Camelback's continuance of the Arboleda listing with Coldwell after July 1981 arguably represented its acquiescence to the arrangement.

Assuming, *arguendo,* however, that the parties intended Amory's July 1981 letter to modify the usual broker-principal arrangement, *see Smith v. Melson,* 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983), any contractual restriction on Coldwell's ability to offer other properties ended when Cam-

elback terminated the exclusive listing agreement the following summer. The termination clause of that agreement expressly provided that, upon termination, "this Agreement and the parties' rights and obligations hereunder shall terminate automatically." The only contractual obligation that survived termination was Camelback's duty to pay a commission if any of Coldwell's prospects made a lease during the six-month extension period.

Because of the previous fiduciary relationship between the parties and the continuing rights and obligations under the extension clause, however, we agree with the court of appeals and the parties themselves that some duty survived the termination. The nature of that duty is established by caselaw: where a listing agreement has been terminated, the fiduciary relationship is ended and the broker "is free to act for himself or the opposing party as long as he does not hinder, delay or interfere" with a transaction which the agreement was intended to bring into being. *Hardy v. Davis*, 223 Md. 229, 234, 164 A.2d 281, 283–84 (1960). *See also Jones v. Allen*, 294 S.W.2d 259, 263 (Tex.Civ.App. 1956).

In *Hardy*, the termination came about because the broker procured a purchaser who had signed a contract to buy. In the case before us, the termination of duties is even less equivocal; Camelback exercised its right to terminate the listing agreement, and Coldwell was expressly forbidden to negotiate further on Camelback's behalf. Thus here, even more than in *Hardy*, it is difficult to find any further duty owed by Coldwell except to refrain from impeding whatever progress Camelback could make with the prospects furnished by Coldwell before termination.

Our review of the facts in this case supports only one possible conclusion—that Coldwell did not intend to and did not in fact hinder, delay or interfere with Camelback's renewed efforts to secure Amex as a tenant. Arguably, the post-termination duty Coldwell owed Camelback is related to the duty of good faith and fair dealing or the duty breached by interference with pro-

spective economic advantage. *See* PROSSER AND KEETON ON THE LAW OF TORTS § 130 (5th ed. 1984). The broker's motive or purpose is then central to our inquiry. *Id.* at 1009.

In this case, Camelback, the owner, consciously withheld information from Coldwell about the renewed negotiations with Amex. Between October 1982, when all parties believed the Amex–Camelback lease was "dead," and the time of Coldwell's alleged acts of interference, therefore, Coldwell knew of no dealings with which it might have intended to interfere. Whatever its conduct, it logically could not have intended to invade Camelback's interests. Nor would Coldwell have had anything to gain from so doing; if successful, Camelback's renewed negotiations with Amex would have brought a tenant to Camelback and a commission to Coldwell.

In any event, there is no evidence that Coldwell attempted to "lure" Amex from the Arboleda to the Hartford, as the trial court suggested. Amex's Newberry had seen the Hartford rise from the ground. His superiors had told him to look at the Black Canyon Corridor. He had independently gone to view the Hartford building after his company rejected the Arboleda proposal and before his meeting with Amory on October 12, 1982. It was in response to Newberry's request at this meeting that Amory prepared a proposal for a Hartford lease. Amex's proposed switch from the Arboleda to the Hartford was its idea, not Coldwell's.

Finally, we agree with the court of appeals' dissenting opinion that Camelback failed to prove it would have closed its deal with Amex any sooner or at any less cost if Coldwell had not facilitated Amex's consideration of the Hartford. 156 Ariz. at 225, 751 P.2d at 541 (Meyerson, J., dissenting in part). Camelback conceded at trial that the financial concessions it made to Amex were necessitated by market forces, not any coercion for which Coldwell may have been responsible. In neither Coldwell's state of mind, conduct, nor impact do we find evidence of a breach of its duty not to

**232**

hinder, delay or interfere with Camelback's consummation of a lease with Amex.

Since we hold that this is the only duty Coldwell owed Camelback after the termination of their exclusive listing agreement, we, like the court of appeals, necessarily reject Camelback's contention that Coldwell breached a duty to disclose to Camelback the status of Amex's interest in both the Arboleda and Hartford building. Indeed, the argument illustrates the difficulty of Camelback's entire position. Having been terminated in its relationship with Camelback, but having an ongoing broker's relationship with and duty to Hartford, Coldwell might well have had to answer to Hartford if it failed to comply with Amex's request to show the Hartford building. In any event, it is difficult to see what Coldwell could have told Camelback that the latter did not already know. Amex was in the market for office space; once Amex rejected the Arboleda it would seek another property. Certainly Camelback realized that some broker, whether Coldwell or another, would be presenting numerous other properties, if not the Hartford building then another.

Assuming, *arguendo*, that Coldwell had a duty of disclosure to its former principal, however, we believe that it was performed. As we noted above, on October 12, 1982 Amory and Newberry discussed the need to inform Camelback of Amex's rejection of the Arboleda proposal. Because of Newberry's long personal association with Darley and their practice of dealing directly with one another, Newberry undertook the communication. Within days, Amory verified that it was made. Amory then personally spoke to Grace, albeit in response to Grace's numerous telephone calls. He both confirmed the news that Amex had rejected the proposal and related Coldwell's involvement with Amex in the Hartford. Amory's alleged failure to return Grace's telephone calls may have been a breach of etiquette but is hardly cognizable as a breach of legal duty.

Finally, we reject the trial court's implied holding that Coldwell should have attempted to renew Amex's interest in the Arbole-

da after its rejection of that property. Coldwell was expressly prohibited from taking such action by the listing agreement's provision that, upon termination, Coldwell "shall terminate all negotiations of leases on behalf of Camelback."

### CONCLUSION

In our view, the undisputed evidence establishes that Coldwell's fiduciary duty to Camelback ended when Camelback terminated the listing agreement. From that point forward, Coldwell was under no duty to Camelback except to refrain from hindering, delaying or interfering with Camelback's efforts to lease the Arboleda to prospective tenants presented by Coldwell prior to the termination of the listing. The undisputed evidence shows, further, that Coldwell did not breach this obligation. Accordingly, we approve that part of the court of appeals' decision holding that Coldwell earned a commission and vacate that part holding that it forfeited the commission. The case is remanded to the trial court with directions to enter judgment for Coldwell.

GORDON, C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.