MAX HOLMAN, APPELLANT AND CROSS-APPELLEE, V. PAPIO
NATURAL RESOURCES DISTRICT, APPELLEE AND CROSS-APPELLANT.
421 N.W.2d 430

Filed April 1, 1988.   No. 86-278.

Dixon G. Adams, for appellant.

Lyman L. Larsen and James L. Schneider of Kennedy, Holland, DeLacy & Svoboda, and Paul F. Peters of Paul Peters, P.C., for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and RIST and CLARK, D. JJ.

BOSLAUGH, J.

The plaintiff, Max Holman, owns an irregularly shaped 40-acre tract of land in Sarpy County, Nebraska. The tract is bordered on the south by the north bank of the Platte River, on the west and north by the right-of-way of the Burlington Northern Railroad, and on the east by U.S. Highway 73-75.

In 1968, the U.S. Army Corps of Engineers constructed a levee system, known as R-613, to protect land lying east of the

plaintiff's property from flooding. As a part of that project a floodgate was installed on the west end of a culvert, described as a 4- by 4-foot concrete box culvert, which runs underneath Highway 73-75 and provides drainage from west to east. When the floodgate is closed, no water can pass through the culvert.

When the project was completed, it was turned over to the defendant, Papio Natural Resources District, for operation and maintenance.

In June 1984, the largest flood ever recorded on the Platte River occurred. A flood of this magnitude had a statistical probability of occurring about once in 50 years. On June 14, 1984, the floodgate at the culvert was closed, preventing any water from draining through the culvert.

The plaintiff commenced this action on September 7, 1984, to recover damages caused by the flooding of his property alleged to have resulted from the closing of the floodgate and to enjoin the defendant from closing the floodgate in the future.

Although the plaintiff sought damages for an alleged taking and damaging of his property in violation of Neb. Const. art. I, § 21, we treat the case as an action in equity for injunctive relief. We review the trial court decree de novo without reference to the findings of fact made by the trial court, but take into consideration the fact that the trial court saw and heard the witnesses and viewed the premises and gave appropriate weight thereto. *Grint v. Hart*, 216 Neb. 406, 343 N.W.2d 921 (1984).

The plaintiff's property is protected by a dike, privately constructed, which commences near the Highway 73-75 bridge over the Platte River and runs west along the bank of the river, then north and east along the boundary of the Burlington Northern right-of- way, and then south along the east boundary of the plaintiff's property. The Missouri Pacific Railroad right-of-way is located west and north, parallel and adjacent to the Burlington Northern right-of-way. Sometime after the R-613 project was completed, the county constructed a "plug" or tie-back dike between the plaintiff's dike and the Burlington Northern grade near the bank of the river. This dike tends to prevent floodwater from the river's entering the "ditch" between the plaintiff's dike and the railroad grade.

The evidence shows that a natural drainageway, which the

plaintiff refers to as "Blackman's Creek," exists along the northern edge of the plaintiff's property. At an earlier time, trestles on the railroads allowed water draining from the north to flow under the railroad tracks and then drain to the east away from the plaintiff's property. Later, the trestles were filled in and culverts were constructed through the railroad grades. When the culverts became clogged, water would seep through the subgrade and then flow to the east.

Highway 73-75 crosses the railroad tracks on an overpass. Around 1967, as a part of the R-613 project, the grade of the highway was raised so that it forms an embankment protecting the property to the east from floodwaters coming from the west. Water which formerly drained to the east along the south edge of the Burlington Northern right-of-way now drains to the south along the west edge of the highway, then to the east through the culvert, then to the north along the east edge of the highway, and then to the east along the course of the natural drainageway.

The record shows that in the early morning hours of June 14, 1984, a portion of a dike located just upstream from Holman's land on the same side of the river, and known as the gun club dike, gave way.

On the morning of June 14, 1984, Marlin Petermann, an engineer employed by the defendant, received a call from field personnel at the site of the flooding. He arrived at the site at approximately 10 or 10:30 a.m. He observed water to be inundating the area to the west of Highway 73-75 and saw water passing through the box culvert to the protected side of the R-613 project. He further observed that water was entering the Holman property across a low spot in Holman's dike, located at the northeast corner of his property and nearly adjacent to the box culvert. Petermann testified that between 10:30 a.m. and 2:30 p.m. (before the floodgate was closed), the water level in Holman's small lake rose approximately 5 feet. The rise was due, he said, primarily to the water's flowing over the low point in the dike, and also due to seepage. Water from the small lake then flowed south over Holman's driveway and into the larger lake to the south.

James Dean Miller, a median equipment operator employed

by the defendant, testified that he attempted, pursuant to instructions, to close the floodgate around 10 that morning. However, as he attempted to close the gate using an electric drill as power, Holman threw the drill into the water. Miller stated that he returned to the site later that afternoon and closed the floodgate around 2:30 to 2:45 p.m.

Holman disputed the testimony that the floodgate was closed around 2:30 p.m. and testified that the gate was closed at 10:30 a.m. He stated that no water had crossed his dike adjacent to the floodgate until shortly after 10:30 a.m. He stated that the water crossed his driveway around noon, after having filled up the small lake.

Petermann testified that the water was indeed going over the driveway at the time Holman indicated, but that it was not due to the closing of the floodgate because the gate was not closed until 2:30 p.m. It was his opinion that the Holman property would have flooded regardless of whether the floodgate was open or shut. He based his opinion on the fact that the water was already flowing over the low point in the dike before the floodgate was closed.

The low spot on Holman's dike has an elevation of 967.5 feet above mean sea level. At the time the floodgate was closed, the elevation of the water at the floodgate was 968.6 feet above mean sea level, about 1.1 feet higher than the low spot on the dike. The inlet elevation of the culvert is 961.99 feet; the outlet elevation is 961.2 feet. Water flowed over the low point for an additional 9 days.

The floodgate was closed by the defendant pursuant to the instructions contained in the operation and maintenance manual prepared by the Corps of Engineers, which provided that the floodgate should be closed if water at the gate's location reached a level of 967 feet above mean sea level. That elevation was chosen because at the time the Corps of Engineers was working on the project, a site survey indicated that the low point of Holman's dike had an elevation of 966.8 feet above mean sea level. The fact that more current surveys indicate a low point of 967.5 feet was explained by Petermann as a change that occurred by adding dirt or somehow raising that portion of the dike since the original site survey in 1968.

However, the evidence is that the floodgate was not closed until the water reached 968.6 feet, 1.6 feet higher than the level specified for closing the gate and 1.1 feet higher than the low point on the dike.

The trial court found that Holman had failed to establish the presence of a watercourse, that the rule of law as to surface waters should apply instead, and that Holman's land was already flooding when the floodgate was closed. The trial court enjoined the defendant from closing the floodgate until water reaches a height of 967 feet above mean sea level and refused to award damages to Holman.

Holman has appealed and makes the following four assignments of error: (1) The court erred in finding that the culvert was not located in a natural watercourse; (2) the court erred in applying the law as to surface waters not concentrated in a watercourse; (3) the court erred in refusing to enjoin the defendant from closing the floodgate; and (4) the court erred in refusing to award damages. The defendant has cross-appealed and contends that the trial court erred in enjoining it from closing the floodgate until water reaches 967 feet above mean sea level.

Neb. Rev. Stat. § 31-202 (Reissue 1984) provides that "[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." The failure to find that the culvert was located in a statutory watercourse is of no consequence in this case. The evidence shows that it is located in a natural drainageway, and the rule applicable to diffused surface waters does not apply.

In *Belsky v. County of Dodge*, 220 Neb. 76, 82, 369 N.W.2d 46, 51-52 (1985), we said:

"[W]hen diffused surface waters are concentrated in volume and velocity and flow into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. . . . '[A] natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage

channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the water which may be reasonably anticipated to drain therein, and that this is a continuing duty.'

"At common law the right to drain surface waters into depressions, draws, swales, and drainways which existed in the state of nature was recognized. Lower lands are, at common law, under a natural servitude to receive the surface water of higher lands flowing along natural depressions on the surface of the ground. This is so, whether or not a live watercourse occupies the natural course. . . .

. . . .

"This court has recognized the right of an upper proprietor to drain surface waters through a well-defined natural course, whether the course be ditch, swale, or drain in its primitive condition, and that such flow cannot be arrested or interfered with to the injury of neighboring proprietors."

Quoting from *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962).

Robert Dreessen, a civil engineer called by the plaintiff, testified that a natural drainageway exists from the point at which the floodwater entered the ditch (from underneath the railroad tracks), continues to the northeast (adjacent to and south of the railroad tracks) past the viaduct, and then continues east. He based his opinion upon examination of aerial photographs, a quadrangle map of the area, and his own visual inspection of the area. He further testified that the Platte River is a meandering stream and that meandering streams tend to braid. Braiding refers to a process whereby water meanders and shifts at a relatively frequent rate from side to side. When the river leaves a meander and starts to accrete, it can leave isolated cutoff channels. The farther away the braid is from the river, the less likely it is to be silted in by the process of flood-borne sediment. He testified that if the railroad embankments were built at the time the braided channel was beginning to

close, the presence of the embankments would tend to retard the accretion process downstream, because water being transported downstream to the east would tend to stop and deposit its sediment load at the railroad embankment.

Chester Worm, a civil engineer employed by the Corps of Engineers, also testified that the Platte is a braided stream. By use of a red marker he transposed from exhibit 73, a 1938 aerial photograph, an area of braid onto exhibit 91, which is a 1982 aerial photograph. The area of braid shown on exhibit 91 follows the approximate line of the drainageway previously identified by Dreessen. Worm testified that the ditch between the Holman property and the railroad tracks and continuing east through Highway 73-75 could have been a natural vent or outlet of the flood channel of the Platte River.

Petermann testified that he believed that the ditch was at one time a braided channel of the Platte. He based his opinion on the fact that the railroad tracks once had trestles underneath them and that he believed the trestles were located at the approximate location of where the culverts under the embankments are today. The purpose of the trestles was to act as a bridge over a stream. The water's running through those trestles indicates there was a braid of the Platte River at that location.

Agnes Burton, a longtime resident of the area, testified that in the early 1900s trestles located under the railroad tracks provided drainage through the embankments. She testified that the water was there winter and summer, that it was approximately 6 to 8 feet deep, and that the water flowed to the east when there was a hard rain. Water entered this area from the hills to the west, and, while she did not know where the water ended up, she did know that it flowed as far east as the Allied Chemical Plant. The Platte River merged with this creek when the water was high in the Platte.

Albert Hartung, a former resident of the area who lived in La Platte in 1918, recalled the railroads' getting water out of the creek south of the Burlington railroad tracks. The source of the water was springs to the west and the Platte River when it rose. The water flowed from west to east and crossed the highway south of the Burlington tracks.

Holman testified that rainwater enters the creek from the hills to the west, flows through the culverts under the embankments, and then flows east and then south to the box culvert.

This testimony shows that "Blackman's Creek" was a portion of a prior braid of the Platte River and that the drainageway was formed in a state of nature.

The fact that the water now flows south along the west edge of the highway, then east through the culvert, and then north back to the original course of the drainageway is not important. As we pointed out in *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985), the mere presence of an artificial element in a drainageway does not destroy its characterization as a natural drainageway. It is only where an essential part of the drainageway is artificial or manmade that such characterization may be precluded.

"A natural drainway must be kept open to carry water into streams, and, as against the rights of an upper proprietor, a lower proprietor cannot obstruct surface water which has found its way into and is moving in a natural drainage channel or depression." *Belsky, supra* at 84, 369 N.W.2d at 53.

"[O]ne building a structure across a natural drainway has a continuing duty to provide natural passage for water reasonably anticipated to move in the drainway occupied by the obstruction." *Belsky, supra* at 84-85, 369 N.W.2d at 53. See, also, *McGill v. Card-Adams Co.*, 154 Neb. 332, 47 N.W.2d 912 (1951).

"Such duty to refrain from structural obstruction of a natural drainway is imposed upon private proprietors and public authorities as well." *Belsky, supra* at 85, 369 N.W.2d at 53. See, also, *Purdy v. County of Madison*, 156 Neb. 212, 55 N.W.2d 617 (1952).

It is clear from the evidence in this case that the floodgate at the west end of the culvert is an obstruction in a natural drainageway when it is closed. The effect of closing the floodgate is to cause water accumulated and flowing in the drainageway to pond and rise and eventually flood the plaintiff's property if in sufficient quantity. The evidence fails to show any right of the defendant to flood the plaintiff's

property by closing the gate. The fact that the plaintiff's property may be flooding to some extent at the time the gate is closed does not give the defendant a right to add additional floodwater to that which the plaintiff may otherwise be subjected to. The trial court should have enjoined the defendant from closing the floodgate unless and until such a right is acquired by eminent domain or otherwise. The cross-appeal is without merit.

Holman's final assignment of error is that the district court erred in refusing to award damages for injury to his land occasioned by the closing of the floodgate.

> [W]here water from another source has been added to water from a source for which a defendant is liable, and the combined waters cause damage, it is incumbent upon the plaintiff to establish either that his or her entire damages would have occurred from the water for which the defendant is liable, or to establish the amount of the damages caused by the water for which the defendant is liable.

*Johnson v. NM Farms Bartlett*, 226 Neb. 680, 691, 414 N.W.2d 256, 265 (1987).

The record in this case shows that water was entering onto Holman's property prior to the time the floodgate was closed. No attempt was made by Holman to differentiate between damage that would have occurred regardless of the closing of the floodgate and damage that occurred due to the closing of the floodgate.

"It is the plaintiff's burden to establish the proximate cause of his injury." *Schmidt v. Chimney Rock Irrigation Dist.*, 209 Neb. 1, 4, 305 N.W.2d 888, 890 (1981). The failure to establish the damages directly attributable to the waters impounded by the floodgate precludes the plaintiff from recovering any damages in this action. *Johnson v. NM Farms Bartlett, supra.*

That part of the judgment of the district court denying damages to the plaintiff is affirmed. In all other respects the judgment is reversed and the cause remanded with directions to enter a judgment in conformity with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.