ROBERT W. FISBECK, APPELLANT, V. SCHERBARTH, INC., A NEBRASKA CORPORATION, APPELLEE.

428 N.W.2d 141

Filed August 12, 1988.    No. 86-742.

William J. Panec for appellant.

Ronald R. Brackle for appellee.

HASTINGS, C.J., CAPORALE, GRANT, and FAHRNBRUCH, JJ., and JOHN MURPHY, D.J.

CAPORALE, J.

Appellant, Robert W. Fisbeck, sued his former employer, appellee, Scherbarth, Inc., a Nebraska corporation, alleging the latter breached its written employment contract with Fisbeck, as the result of which Fisbeck was damaged in that he (a) was deprived of an interest in land he otherwise would have acquired without payment, (b) lost salary he otherwise would have earned, and (c) was not paid wages for certain hours of work. The employer denied Fisbeck's averments and counterclaimed for foreclosure of Fisbeck's interest in the subject land. The district court concluded that there was no written employment contract; that while Fisbeck was entitled to payment for salary he earned but was not paid, his other two claims of damage were without merit; and that the employer

was entitled to foreclose its lien on Fisbeck's undivided one-half interest in the subject land. Fisbeck appeals from the judgment of the district court entered in accordance with its conclusions and assigns seven errors, which may be summarized as claiming that (1) the district court's findings are not supported by the record and (2) the district court erred in computing the amounts owed by the parties to each other. We affirm as modified.

## Facts

Fisbeck began working for the employer while he was still in high school, in 1957 or 1958. In 1969 or 1970, he became a construction crew foreman. Late in 1975, Fisbeck and the employer entered into an arrangement whereunder Fisbeck was to acquire certain land from his employer, on which the Fisbeck home appears to have been built. In this connection the record contains a document captioned "Agreement Secured by Real Estate Mortgage," bearing no date of execution but bearing a notary's stamp dated December 29, 1975, and bearing the signatures of Fisbeck and a Leta R. Fisbeck, as buyers, and of the employer by its president, as seller, and impressed with the employer's corporate seal. The document, henceforth referred to as the "agreement," recites the legal description of a certain lot in Jefferson County and provides the following, notwithstanding the fact that Leta Fisbeck was never shown to have been a member of the employer's work force:

1. All parties hereto agree that the value of the above described real estate is mutually appraised by the parties and has a fair market value at the time of conveyance of the above described real estate in excess of THREE THOUSAND SIX HUNDRED NINETY FIVE AND NO/100 ($3,695.00) DOLLARS.

2. Buyers agree that in return for the deed to the above described real estate, Buyers will repay Scherbarth Inc., by continuing in the employment of Scherbarth Inc., in a satisfactory manner for a period of Ten (10) years.

3. In the event Buyers wishes [sic] to terminate their employment with Scherbarth Inc., for any reason prior to expiration of the ten year period, Buyers agree to repay the sum of THREE THOUSAND SIX HUNDRED NINETY FIVE AND NO/100 ($3,695.00) DOLLARS to

Scherbarth, Inc. This amount can be repaid at the option of Buyers in full immediately or in Five (5) equal annual installments, the first such installment to be paid within Thirty (30) days after termination of employment. Annual installments thereafter shall be on the same date of each year thereafter until said amount is paid in full. Interest shall accrue on the unpaid principal balance at the rate of 8.5% per annum on the unpaid principal balance. Interest shall commence to accrue on the date of termination of employment. Accrued but unpaid interest shall be paid annually on principal payment dates.

4. If Buyers employment is terminated by Scherbarth, Inc. through a lay-off occasioned by a decline in business, termination, or sale of the corporation, such aforementioned condition to be determined solely by appropriate resolution of the Board of Directors for said corporation, at any time during the above ten year period, the amount due to Scherbarth, Inc. shall be THREE THOUSAND SIX HUNDRED NINETY FIVE AND NO/100 ($3,695.00) DOLLARS less a prorated amount as credit for that portion of the ten year period that has expired.

This amount can be repaid at the option of Buyers in full immediately or in Five (5) equal annual installments, the first such installment to be paid within Thirty (30) days after termination of employment. Annual installments thereafter shall be on the same date of each year thereafter until said amount is paid in full. No interest shall accrue on the unpaid principal balance.

5. Buyers agree that if at any time within the Ten (10) year period above specified the above described real estate is sold or transferred by Buyers to any other persons, firm or corporation, the total amount of THREE THOUSAND SIX HUNDRED NINETY FIVE AND NO/100 ($3,695.00) DOLLARS would be due to Seller immediately unless an express written mutual agreement to the contrary is made between Seller and Buyers.

6. Time is of the essence of each and every term and condition of this agreement. If Buyers fail to pay any

amounts due under this agreement or if Buyers fail to perform any of the other terms, covenants and conditions of this agreement or if Buyers shall abandon the real estate, the whole of the indebtedness due under this agreement shall become and be immediately due and payable at the option of Seller without further notice or demand by Seller to Buyers, the said Buyers expressly waiving all notices required by law to be served upon Buyers, and Seller may proceed to foreclose this agreement, promissory note or mortgage in any manner provided by law or to utilize any other remedies allowed Seller by law.

In his testimony Fisbeck characterized the agreement as "a mortgage on the — it's a work agreement. If I'd have been employed there for ten years, I wouldn't have to pay for the land that I purchased from Ted Scherbarth." Fisbeck also testified that his understanding of the agreement at the time he signed was that "I'd stay there ten years and the land would be paid for. If I stayed employed with him for ten years, the land would be paid for." He also testified that the only benefit he received when he "bought" the property was his right to continue his employment. The employer conveyed the subject land in fee simple absolute to "Robert W. Fisbeck and Leta R. Fisbeck . . . as joint tenants with right of survivorship, and not as tenants in common." Fisbeck's uncontroverted testimony is that the deed was executed before he was called upon by the employer's president to execute the agreement.

Fisbeck and Leta Fisbeck also signed a "Promissory Note Secured by Real Estate Mortgage" dated December 29, 1975. This document, henceforth referred to as the "note," which Fisbeck testified he signed in connection with the execution of the previously described agreement, incorporates the agreement by reference, sets interest on Fisbeck's debt to Scherbarth "after default or maturity" at 9 percent per annum, and contains an acceleration clause.

The next document, captioned "Real Property Mortgage," henceforth referred to as the "mortgage," recites the legal description of the subject property and names the employer as mortgagee and Fisbeck and Leta Fisbeck as mortgagors.

Fisbeck testified the mortgage was actually signed somewhat later than the December 29, 1975, date it and the notary's certificate bear, but admitted that, in any event, he understood that the mortgage was related to the agreement and the note and to his purchase of the property.

After signing the agreement, Fisbeck continued working for the employer until at least December 3, 1976, at which time he quit, and after which he made one payment of $739 on the agreement. By not later than September 1978, the employer rehired Fisbeck in his former position of crew foreman. The employer at that time, through its president, Theodore C. Scherbarth, agreed to reaffirm and reinstate the terms of the arrangement entered into in 1975.

The employer provided Fisbeck with a pickup truck, which he drove in connection with the employer's business and which he was privileged to use in connection with his own affairs. Although everyone agrees that the employer's policy was to start paying wages when an employee arrived at a particular jobsite, there is some evidence that all employees were required to report to the employer's headquarters in Fairbury at 7 o'clock in the morning and go from there to the various jobsites. Fisbeck claims that he carried the employer's tools and materials to the jobsite in the company pickup and considered himself responsible for the work crew from the time he left the employer's headquarters until all returned at the end of the day. There is also evidence, however, that there were times when other arrangements were made to transport employees to a jobsite. Moreover, although he quickly retracted it, at one point Fisbeck testified that his hourly rate of pay was increased at least in part to cover the time spent traveling from the employer's headquarters to the various jobsites.

On April 18, 1983, Fisbeck, according to the employer's "engineer manager," Daryl Drewes, angrily refused to perform job tasks assigned to him. However, David Taylor, whom Drewes said had been present, denied any memory of the incident.

On April 23, 1983, a Saturday, Fisbeck was to have worked a full day on a rush project known as the Roode job. The employer's president learned after the fact that Fisbeck had left

the Roode job that Saturday after only a short period of work. According to the employer's president, on Tuesday, April 26, 1983, following a nearly daylong discussion of these events between himself and Fisbeck, it was determined that Fisbeck's relationship with the employer would end. Armondo Leurma, Oscar Meyn, and Taylor, all of whom worked for the employer at the time of the event but none of whom did at the time of trial, testified that they overheard a discussion at a worksite that day, during which the employer's president told Fisbeck, "You're fired." The employer's president testified he did not tell Fisbeck he was fired but that Fisbeck said he would not work on the employer's projects until he had completed an independent project of his own.

### Scope of Review

As a preliminary matter we must establish the scope of this court's review of the district court's factual determinations. Both Fisbeck and the employer assert that by reason of the employer's counterclaim, which involves the foreclosure of a land contract, this case is one in equity to be reviewed de novo on the record. In support of this contention the parties cite *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985). *Nixon* involved a suit for specific performance of a contract; as this court noted there, a suit for specific performance is equitable in nature. In this case, however, Fisbeck sued for damages arising from breach of contract; such a suit is clearly legal in nature. See, e.g., *Communications Workers of America v. Abrahamson*, 228 Neb. 335, 422 N.W.2d 547 (1988); *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988). Where a law action is tried to the court without a jury, the finding of the court has the effect of a verdict and will not be disturbed on appeal unless clearly wrong. *Republican Valley Bank v. Security State Bank, ante* p. 339, 426 N.W.2d 529 (1988); *Kramer v. Mid-Western Development, Inc., ante* p. 86, 425 N.W.2d 336 (1988); *McKinstry v. County of Cass*, 228 Neb. 733, 424 N.W.2d 322 (1988). Moreover, in an action at law tried without a jury, it is not the role of this court to resolve conflicts in or reweigh the evidence, and this court will presume that the trial court resolved any controverted facts in favor of the successful party and will consider the evidence

and permissible inferences therefrom most favorably to that party. *McKinstry v. County of Cass, supra; Kubista v. Jordan,* 228 Neb. 244, 422 N.W.2d 78 (1988).

Yet, as the parties correctly note, a suit in foreclosure is equitable in nature. *Western Fertilizer v. BRG,* 228 Neb. 776, 424 N.W.2d 588 (1988); *Graff v. Burnett,* 226 Neb. 710, 414 N.W.2d 271 (1987). In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial court heard and observed witnesses and accepted one version of the facts rather than another. *Southern Lumber & Coal v. M. P. Olson Real Est., ante* p. 249, 426 N.W.2d 504 (1988); *Kula v. Prososki,* 228 Neb. 692, 424 N.W.2d 117 (1988); *Ames v. George Victor Corp.,* 228 Neb. 675, 424 N.W.2d 106 (1988). In this case we have not a suit in foreclosure, but a counterclaim for foreclosure. It is apparent that *Nixon, supra,* does not address the question presented by this case, namely, What is the scope of review accorded a case brought as a matter of law in which a counterclaim in equity has been asserted?

This court appears to have considered precisely this question in four vintage cases. In the earliest of these, *Hotaling v. Tecumseh Nat. Bank,* 55 Neb. 5, 7-8, 75 N.W. 242, 243 (1898), we said:

> The refusal of the trial court to submit the issues to a jury is the first error assigned. The case made by the petition was an ordinary legal action to recover damages for breach of contract, and the issues of fact raised therein were, of course, triable to a jury. . . . But the answer presented an equitable counter-claim. . . . These allegations of the answer were traversed by the reply, and the issues of fact thus arising were triable to the court without a jury. In 7 Ency. Pl. & Prac. 810, the rule is thus stated: "When an equitable defense is presented, it is to be decided by the court as if it were an equitable proceeding, before other issues are determined, because the

determination of the equitable issues in favor of the defendant would put an end to the litigation, and obviate the necessity of trying the legal issues involved." And in *Peden v. Cavins*, 134 Ind. 494, it is said that "a demand for a jury trial should only include a demand for the trial of such issues as are triable by a jury, and when several issues are joined in a cause, some triable by jury and some by the court, and a demand for a jury to try all the issues is made, it is not error to refuse it." . . . The action of the trial court in trying the issues without a jury was, therefore, not erroneous.

The next case to consider our problem was *Jewett v. Black*, 60 Neb. 173, 82 N.W. 375 (1900). There, Jewett sold an undeveloped piece of real estate to Sanford on a land contract. Sanford then sold the real estate to Black, also by land contract. Black erected considerable improvements, including two dwelling houses. Sanford then defaulted on his contract with Jewett and subsequently surrendered his contract to Jewett, who brought an action in ejectment against Black. Black counterclaimed, "demanding a specific execution of the surrendered contract," *id.* at 176, 82 N.W. at 376, a demand which both the trial court and this court considered equitable in nature. The trial court ruled for Black on the counterclaim, Jewett appealed, and in an interesting variation from the facts in the case presently before us,

> [c]ounsel for [Black] contend that the petition determines the character of the action, and that the plaintiff having sued for the possession of the property in controversy, the judgment rendered in the action is not subject to review by appeal. To this proposition we can not agree. The answer of the defendant states facts which it is claimed constitute a cause of action against the plaintiff for specific performance of a contract. That is the action which has been tried; it is the action in which judgment has been rendered. It is the case presented by the record for review. Upon this point the decision in *Hotaling v. Tecumseh Nat. Bank*, 55 Nebr. 5, [75 N.W. 242 (1898),] is of controlling authority.

*Id.* at 176-77, 82 N.W. at 376.

Some time later, in *Card v. Deans*, 84 Neb. 4, 5, 120 N.W. 440, 441 (1909), this court stated:

> Plaintiff complains because he was refused a jury trial. The petition was such as is usual in actions in ejectment, but the defendant alleged ownership of the real estate, and prayed for affirmative equitable relief, which could not be granted in a jury trial. This court has held that in a law action where the answer sets up an equitable counterclaim the cause is triable to the court. *Hotaling v. Tecumseh National Bank*, 55 Neb. 5 [75 N.W. 242 (1898)]. In *Jewett v. Black*, 60 Neb. 173, [82 N.W. 375 (1900),] it was held that in an action in ejectment where the defendant prays for affirmative equitable relief, and pleads facts entitling him thereto, the issues are triable to the court without a jury. The case at bar falls within this rule, and a jury trial was properly denied.

More recently, in *Van Horn v. Lincoln Sales Outlet Co.*, 127 Neb. 301, 255 N.W. 36 (1934), Van Horn sued for damages for breach of an employment contract, and the defendants, alleging that Van Horn had been a partner in the firm, counterclaimed for an accounting. Van Horn demurred to the cross-petition; the demurrer was sustained; and the defendants appealed. Reasoning that Van Horn's demurrer constituted an admission of the defendants' allegation that he had been a partner in the firm, this court, citing *Hotaling, supra, Jewett, supra*, and *Brown v. Keith*, 1 Neb. (Unoff.) 649, 96 N.W. 59 (1901), about which more will be written shortly, concluded:

> The answer standing unattacked by demurrer of course would constitute a defense. The cross-petition raises the right of equitable relief, affirmatively prayed for. We are not deciding what the lower court should or should not have done on the motion to strike the cross-petition, but decide this matter solely on the basis of the demurrer filed. In view of the holdings of this court, we are of the opinion that the demurrer should have been overruled and the cause should be tried to the court as an equity action.

127 Neb. at 307, 255 N.W. at 39.

The cases reviewed above state or cite to the rule we are exploring in essentially these terms: "Where the answer to a

petition in law presents an equitable counterclaim, which is traversed by a reply, the issues of fact thus arising are triable to the court without a jury." Unfortunately, standing alone, this formulation of the rule leaves somewhat ambiguous which issues of fact are to be tried without a jury: those raised by the counterclaim only, or those raised by all the pleadings. In other words, this statement of the rule, standing alone, leaves unanswered the question, Does presentation of an equitable counterclaim convert the entire action into one in equity, or is the separate law character of the other pleadings preserved? As this court pointed out in its first pronouncement on the matter, " 'a demand for a jury should only include a demand for the trial of such issues as are triable by a jury . . . .' " *Hotaling v. Tecumseh Nat. Bank*, 55 Neb. 5, 7, 75 N.W. 242, 243 (1898). *Hotaling* teaches that when legal matters are presented in a petition and equitable matters presented in a counterclaim, questions of fact arising from the counterclaim are to be determined first by the court sitting as a court in equity; if these determinations do not conclude the entire litigation, then factual questions arising from other pleadings, those in law, may be submitted to a jury or to the court as finder of fact in law, as the parties see fit. However, it is not error to deny a motion which cannot be allowed in toto. *Vore v. State*, 158 Neb. 222, 63 N.W.2d 141 (1954); *Draper v. Taylor*, 58 Neb. 787, 79 N.W. 709 (1899). Thus, as *Hotaling v. Tecumseh Nat. Bank, supra*, held, where the petition states an action in law, the counterclaim one in equity, and demand is made to try all factual issues to a jury, it is not error for the trial court to refuse such demand in its entirety and to try all issues to the court. This, then, is the rule in Nebraska.

Nebraska is not alone in adhering to this rule. See, e.g., *Turner v. Burlington Northern R. Co.*, 771 F.2d 341 (8th Cir. 1985) (questioned on an unrelated issue in *Kansas City Laborers Pension F. v. Paramount Indus.*, 829 F.2d 644 (8th Cir. 1987)); *Atlantic Veneer Corporation v. Sears*, 232 N.W.2d 499 (Iowa 1975); *Sowles v. Beaumier*, 227 A.2d 473 (Me. 1967); *Quine et ux v. Sconce*, 209 Or. 486, 306 P.2d 420 (1957).

Of the Nebraska cases reviewed above, only *Jewett v. Black*, 60 Neb. 173, 82 N.W. 375 (1900), may be said to apply the rule

under consideration in a manner consistent with its expression in *Hotaling, supra. Card v. Deans*, 84 Neb. 4, 120 N.W. 440 (1909), suggests too broad an interpretation of the *Hotaling* rule, for *Hotaling* never intended the mere filing of a counterclaim in equity to deny a plaintiff in law the right to a jury trial. Language in *Card* which so suggests is inaccurate. The same is true of the language in *Van Horn* which suggests a like result. See, also, *Simmons v. Baker*, 109 Neb. 853, 192 N.W. 511 (1923), in which the trial court accommodated the various parties' rights through use of an advisory jury; the statement there, however, that "[t]he issue, therefore, became triable to the court without a jury," is improvident. *Id.* at 853-54, 192 N.W. at 511.

Returning, as promised, to *Brown v. Keith*, 1 Neb. (Unoff.) 649, 96 N.W. 59 (1901), we note that this case too presents an opportunity for confusion, which we here forestall. In *Brown*, the plaintiff alleged breach of an employment contract and prayed for damages. "To this, and the other counts of this petition, the defendant answered setting up an equitable defense, and the reply of the plaintiff thereto was a general denial." *Id.* at 650, 96 N.W. at 60. Although it appears that in the older cases the notion of "equitable defenses" may have included equitable counterclaims, see, e.g., *Hotaling v. Tecumseh Nat. Bank, supra*, such is not the case today. As this court noted in *McGerr v. Marsh*, 148 Neb. 50, 58, 26 N.W.2d 374, 378 (1947):

> The term counterclaim is broader and more comprehensive than recoupment, set-off, or cross-action, and, subject to statutory limitations, secures to defendant the full relief which a separate action at law or in equity would have secured. . . .
>
> Such claim or demand must be more than a mere defense to plaintiff's cause of action, or in reduction of his damages; "it must be an existing, valid, and enforceable cause of action in favor of the defendant against the plaintiff."

(Citations omitted.) Clearly, the rules regarding equitable defenses are not necessarily the same as those regarding equitable counterclaims. See, e.g., *White v. Medico Life Ins.*

*Co.*, 212 Neb. 901, 327 N.W.2d 606 (1982); *The Tilden Bank v. Retzlaff*, 188 Neb. 834, 199 N.W.2d 734 (1972).

It is also clear that the *Hotaling* rule under consideration does not alter the equally time-honored principle that if a court of equity has properly acquired jurisdiction in a suit for equitable relief, it may make complete adjudication of all matters properly presented and involved in the case and grant relief, legal or equitable, as may be required and thus avoid unnecessary litigation. See, e.g., *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978) (presents an obverse situation to that presented here: plaintiff Kuhlman had filed suit in equity, and defendants Cargile had filed a counterclaim sounding in law). Similarly, where the proof fails to establish a right to equitable relief, the court will nonetheless retain jurisdiction for the purpose of administering complete relief between the parties with respect to the subject matter. *Trump, Inc. v. Sapp Bros. Ford Center, Inc.*, 210 Neb. 824, 317 N.W.2d 372 (1982). In Nebraska, equity acquires jurisdiction over the action when the averments of the pleadings and the relief sought indicate that the main object of the action is equitable in nature. See, e.g., *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988) (and cases cited therein); *Holman v. Papio Nat. Resources Dist.*, 228 Neb. 94, 421 N.W.2d 430 (1988) ("Although the plaintiff sought damages for an alleged taking and damaging of his property in violation of Neb. Const. art. I, § 21, we treat the case as an action in equity for injunctive relief." *Id.* at 95, 421 N.W.2d at 432). Furthermore, as this court observed in *Klitzing v. Didier*, 215 Neb. 122, 337 N.W.2d 418 (1983), new and distinct matter not maintainable as a counterclaim under statutory provisions and not involved in a proper termination of the subject matter of the original suit must be litigated in a separate action.

It is apparent that in the district court, Fisbeck, had he sought a jury trial on his petition, would have been entitled to one, although factual issues arising in the context of the employer's counterclaim would have been submitted first to the court in equity. Fisbeck, however, suffered his claims to be tried to the court, thereby waiving his right to a jury. *Trump, Inc. v. Sapp Bros. Ford Center, Inc., supra*; *McKinney v. County of*

*Cass,* 180 Neb. 685, 144 N.W.2d 416 (1966); *Miller v. Knight,* 146 Neb. 207, 19 N.W.2d 153 (1945); *Helming v. Forrester,* 87 Neb. 438, 127 N.W. 373 (1910), *overruled on other grounds Criswell v. Criswell,* 101 Neb. 349, 163 N.W. 302 (1917). On facts such as these, it is entirely appropriate for the trial court to consider all factual issues at one time, bearing in mind that it speaks as a court of law regarding issues of fact arising from the pleadings in law, and as a court of equity regarding issues of fact arising from the equitable counterclaim.

Applying the *Hotaling* rule to the facts of the present case, we see that Fisbeck's suit, representing an action at law, and the employer's counterclaim, representing an action in equity, must be reviewed separately in this court, with the legal standard of review applied to the district court's determinations of Fisbeck's action, and the equitable or de novo on the record standard applied to the employer's counterclaim. See *Atlantic Veneer Corporation v. Sears,* 232 N.W.2d 499 (Iowa 1975). See, also, *Allen v. AT&T Technologies,* 228 Neb. 503, 423 N.W.2d 424 (1988) (according differing standards of review to separate law and equity actions consolidated for trial).

*Analysis*

Having at last determined the scope of this court's review, we proceed to a consideration of Fisbeck's assignments of error.

Fisbeck's claim that he was damaged because the termination of his employment deprived him of the ability to acquire the subject land without further payment rests on the premise that the agreement required the employer to keep him employed for a period of 10 years absent occurrence of the events contemplated by paragraph 4 of the agreement. The employer's claim of foreclosure in turn rests on the premise that there was no such obligation on its part. Thus, as established in the *Scope of Review* section of this opinion, to the extent factual questions may be involved, Fisbeck's employment claim is to be reviewed under a different standard than is the employer's foreclosure counterclaim. However, regardless of the differing standards of review accorded factual questions, this court has an obligation to reach an independent conclusion on a question of law. *Monahan v. School Dist. No. 1, ante* p. 139, 425 N.W.2d 624 (1988); *Ames v. George Victor Corp.,* 228 Neb.

675, 424 N.W.2d 106 (1988); *Communications Workers of America v. Abrahamson*, 228 Neb. 335, 422 N.W.2d 547 (1988). Moreover, if a written contract is expressed in unambiguous language, it is not subject to interpretation and construction, and the intention of the parties must be determined from the contents of the contract document. *Lueder Constr. Co. v. Lincoln Electric Sys.*, 228 Neb. 707, 424 N.W.2d 126 (1988); *Osmond State Bank v. Uecker Grain*, 227 Neb. 636, 419 N.W.2d 518 (1988); *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987); *Washington Heights Co. v. Frazier*, 226 Neb. 127, 409 N.W.2d 612 (1987). The determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contention of the parties; thus, the fact that the parties urge opposing interpretations does not necessarily indicate a document is ambiguous. *Lueder Constr. Co. v. Lincoln Electric Sys., supra*; *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987). Nor may a party be permitted to pick and choose among the clauses of a contract, accepting only those which advantage it; thus, a contract must be read as a whole, and, if possible, effect must be given to every part thereof. *Lueder Constr. Co. v. Lincoln Electric Sys., supra*. Finally, in the absence of anything indicating a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eyes of the law, one instrument and will be read and construed together as if they were as much one in form as they are in substance. *Kearney Centre Inv. v. Thomas, ante* p. 21, 424 N.W.2d 620 (1988); *Peterson v. Hynes*, 220 Neb. 573, 371 N.W.2d 664 (1985).

## Employment

Applying those rules concerning the reading of contracts to the documents before us compels the conclusion, as a matter of law, that the employer was not obligated to keep Fisbeck on its work force for any period of time. The agreement and related instruments merely evidence an arrangement to buy and sell real estate, provide for alternate methods of payment, and secure the seller until fulfillment of the arrangement. Thus, the district court's legal conclusion that Fisbeck had no written

contract for a specific period of employment is correct. The district court's factual finding that Fisbeck was properly fired is not clearly wrong. Accordingly, Fisbeck is entitled to no damages on his theory that he lost salary he would have earned under the agreement.

## Foreclosure

This brings us to the employer's counterclaim. Our de novo review of the record convinces us that the agreement was entered into on December 29, 1975; thus, the 10-year period would have ended on December 29, 1985.

It is clear that Fisbeck was employed for at least 11 months following execution of the agreement with the employer, and for 55 months from the time of his return in 1978 until he was fired in 1983. Fisbeck is therefore entitled under the terms of the agreement to prorated credit for 66 months of employment; this represents 55 percent of the 120 months making up the stated 10-year term of the agreement. Fisbeck's debt to the employer is therefore reduced to $1,662.75, and further reduced by the amount paid by Fisbeck to the employer, under the agreement, on December 23, 1976, $739, leaving Fisbeck indebted to the employer in the amount of $923.75. The agreement provides that no interest is to accrue on this amount until default, after which interest is to accrue at the rate of 9 percent per annum. Fisbeck was to have paid the $923.75 to the employer immediately upon termination, or to have made the first of five equal annual installment payments within 30 days after termination, or by May 26, 1983. Fisbeck did not do so and has been in default on the agreement since. Fisbeck therefore owes the employer the amount of $923.75, with interest accruing at the rate of 9 percent per annum from May 26, 1983, until payment, and the employer has a lien against the land in that amount rather than the $3,738.69 with interest from June 5, 1986, as found by the district court. Since Leta Fisbeck was not made a party to this action, the lien, as properly determined by the district court, extends only to Fisbeck's individual one-half interest in the property.

## Hours Worked

Finally, Fisbeck asserts he is entitled to wages he earned by performing work-related tasks at the employer's headquarters

many mornings prior to his departure for and arrival at various jobsites, but for which he was not paid. Notwithstanding the district court's factual finding that Fisbeck knew that under the terms of his employment he was to draw wages only from the time he arrived at a jobsite, it awarded him $92.80 under the authority of the federal Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (1982). That act requires that employers subject to its provisions pay each covered employee specified wages for all hours worked. In oral argument before this court, however, Fisbeck conceded that there is absolutely nothing in the record to indicate that the employer is involved in interstate commerce and thus subject to the provisions of the act. Indeed, the record does not tell us the exact nature of the employer's business; it only tells us that the employer is engaged in constructing or erecting something. Without at least some minimal showing as to the employer's relationship to interstate commerce, the Fair Labor Standards Act cannot be said to apply. See, e.g., *Banks v. Mercy Villa Care Center*, 225 Neb. 751, 407 N.W.2d 793 (1987). Thus, it must be concluded that the district court erred as a matter of law in entering judgment in favor of Fisbeck under the authority of that act.

Nevertheless, Fisbeck cites *Bolan v. Boyle*, 218 Neb. 85, 352 N.W.2d 586 (1984), and *North v. City of Omaha*, 215 Neb. 107, 337 N.W.2d 409 (1983), as supporting this claim for wages.

In *Bolan v. Boyle, supra*, the plaintiff civilian employees of the city of Omaha worked under a written contract of employment, arrived at through collective bargaining with their union, which provided in relevant part:

"Employees of the Public Safety Department shall receive a one-half (1/2) hour meal period without pay, and such meal period shall not be considered as time worked, except for those employees who by the nature of their work are required to be on duty for eight (8) consecutive hours, in which case they shall receive a one-half (1/2) hour meal period with pay and such time shall be considered as time worked."

(Emphasis omitted.) *Id*. at 87, 352 N.W.2d at 588. The issue *Bolan* presented was whether the plaintiffs were "employees who by the nature of their work are required to be on duty for

eight (8) consecutive hours." This court found that they were and that they were entitled to compensation *under the terms of their contract*.

While in *North v. City of Omaha, supra,* we noted that substantial authority exists for the proposition that work not requested but permitted is worktime and compensable, the case rested on the provisions of the ordinances which delineated the terms of the city's employment contract with its auto repair foremen. These ordinances provided, among other things:

> "Eight (8) hours shall constitute a day's work and five (5) calendar days shall constitute a week's work for all municipal employees . . . .
>
> ". . . Overtime worked by municipal employees shall be compensated by pay or compensatory time off in accordance with the following procedures . . .. . Work performed in excess of forty (40) hours per week shall be compensated at the rate of time and one-half for the number of hours of overtime worked . . . ."

*Id.* at 108, 337 N.W.2d at 410. In *North,* the question was, Is lunch time and the period prior to the start of the workday, during which the employer permitted the plaintiffs to work, compensable under the employment terms of the quoted ordinances? This represents a situation quite different from that presented in this case. In this case the contract of employment to which Fisbeck agreed when he returned to work for the employer in September 1978 provided that he was not to receive compensation for tasks performed prior to arrival at the jobsite. There is, however, evidence from which a trier of fact could find that in recognition of the work performed by Fisbeck prior to arrival at the jobsite, the employer had increased the wages paid him while at the jobsite. Thus, under the terms of his contract with the employer, Fisbeck's claim in this regard must fail.

### Decision

Accordingly, the judgment of the district court is affirmed as modified in this opinion.

AFFIRMED AS MODIFIED.